Argued January 5, affirmed February 8, rehearing denied September 27, 1927.

## STATE v. JAMES S. TRENT.

(252 Pac. 975; 259 Pac. 893.)

**Criminal Law—Code Adopts Common-law Meaning of "Manslaughter" as Degree of Homicide (Or. L., §§ 1897, 1898).**

1. Sections 1897, 1898, Or. L., adopt the common-law meaning of manslaughter as a degree of homicide; "manslaughter" is the unlawful killing of a human being without malice, either express or implied.

**Indictment and Information—Defendant Charged With Murder may be Convicted of Any of Lower Degrees of Homicide.**

2. A person indicted for murder may be convicted of any one of the lower degrees of homicide.

**Indictment and Information—Indictment for Second Degree Murder Held to Include Charge of Involuntary Manslaughter Within Constitutional Provision That Accused must be Informed of Charge Against Him (Const., Art. I, § 11).**

3. An indictment for second degree murder *held* sufficiently to inform the accused of the nature of the charge against him under Constitution, Article I, Section 11, to support a conviction of manslaughter.

---

1. See 13 R. C. L. 783.
2. Conviction of lesser offense than that charged, see notes in 63 L. R. A. 404; 43 L. R. A. (N. S.) 815; 21 A. L. R. 603; 27 A. L. R. 1097. See, also, 13 R. C. L. 757.

Homicide—Accused Fatally Shooting Another, Though Unintentionally, Held Guilty of Manslaughter in View of Statute Making Pointing of Firearm Unlawful (Or. L., § 1925, as Amended by Laws 1925, p. 172).

4. Where accused fired a gun toward another merely to frighten him, but the shot resulted in death, the accused is guilty of manslaughter in view of Section 1925, Or. L., as amended by Laws of 1925, page 172, making pointing a firearm at another unlawful.

Criminal Law—Where Instructions Given Covered Every Issue, Refusal to Give Additional Requested Charges, Though Stating Law Correctly, Held not Error.

5. Where the trial court covers properly every issue in the case with the instructions that are given, it is not error to refuse to give additional charges requested, although they state the law correctly.

Criminal Law—Giving Abstract Instruction Even Though Stating Incorrectly Defendant's Contentions, Held Harmless Error.

6. That court, in a murder prosecution, incorrectly stated defendant's contentions and gave abstract instructions not limited to the evidence, *held* harmless error, where the verdict was not improper.

### ON PETITION FOR REHEARING.

Homicide—Defense of Accidental Killing Should be Submitted to Jury, if Any Testimony Tends to Establish It.

7. Defense of accidental killing should be submitted to jury, in murder trial, if there is any testimony tending to establish it.

Homicide—Shooting Deceased in Back While Lawfully Driving on Public Highway was not Slaying by "Accident or Misfortune" While Doing "Lawful Act by Lawful Means" (Or. L., § 1910).

8. Shooting of deceased in the back while lawfully driving automobile on public highway was not slaying by "accident or misfortune" while doing a "lawful act by lawful means," within Section 1910, Or. L., though defendant, believing his gun was loaded with rice, and that deceased and his companions had halted to steal watermelons from defendant's patch, fired to scare them.

Homicide—"Justifiable Homicide" and "Excusable Homicide" are Often Used Synonymously.

9. Terms "justifiable homicide" and "excusable homicide" are often used as synonymous.

Homicide—Abstract Instruction on Manslaughter Held Harmless, as Favorable to Defendant.

10. Instruction that defendant was guilty of manslaughter, if he shot deceased to prevent theft of watermelons worth less than $35, *held* harmless, though abstract, being favorable to defendant.

5. See 13 R. C. L. 932.
10. Homicide in defense of property, see notes in 25 A. L. R. 508; 32 A. L. R. 1541; 34 A. L. R. 1488.

**Homicide—Abstract Instruction on Self-defense is Harmless.**

11. Giving of either correct or erroneous instruction on self-defense is harmless, where accused does not claim self-defense, or there is no evidence warranting acquittal on such ground.

**Homicide—Intentional Pointing of Gun at, and Causing It to Kill, Another, Constitutes "Manslaughter," Notwithstanding Reasonable Care not to Load It With Buckshot (Or. L., § 1925, as Amended by Laws 1925, p. 172).**

12. Intentional pointing of gun at another within shooting distance, in violation of Section 1925, Or. L., as amended by Laws of 1925, page 172, and causing it to kill latter, amounts to "manslaughter," notwithstanding use of reasonable care not to load it with buckshot, instead of wheat or other harmless substance.

**Homicide—"Self-defense" is Used in Broad Sense in Statute Prohibiting Pointing of Gun at Another, Except in Self-defense (Or. L., § 1925, as Amended by Laws 1925, p. 172).**

13. Term "self-defense" is employed in a broad sense in Section 1925, Or. L., as amended by Laws of 1925, page 172, declaring it unlawful purposely to point gun within range thereof at any other person, except in self-defense.

**Homicide—Killing of One Lawfully Driving on Public Highway, in Belief That He had Stopped to Steal Melons from Defendant's Patch, Held not "Justifiable" (Or. L., § 1909, subd. 2).**

14. Killing of one lawfully driving automobile on public highway *held* not "justifiable," within Section 1909, subdivision 2, Or. L., though defendant thought that deceased and his companions had stopped to steal watermelons from defendant's patch; deceased not being engaged in commission of felony on defendant's property.

**Criminal Law—Intentionally Pointing Gun in General Direction of Another is Malum in Se—"Toward" (Or. L., § 1925, as Amended by Laws 1925, p. 172).**

15. Defendant intentionally pointing gun in general direction of deceased, while latter and his companions, who defendant thought had stopped to steal watermelons from defendant's patch, were lawfully driving on public highway, committed an offense *malum in se*; "toward" in Section 1925, Or. L., as amended by Laws of 1925, page 172, meaning "in the direction of."

**Criminal Law—Offense "Malum in Se" is Naturally Evil, While Act "Malum Prohibitum" is Made Wrong by Statute.**

16. An offense *"malum in se"* is one which is naturally evil, as adjudged by sense of civilized community; but act *"malum prohibitum"* is wrong only because made so by statute.

**Homicide—Killing Caused by Act Made Misdemeanor by Statute may Constitute Manslaughter.**

17. That act causing homicide was not a misdemeanor at common law does not relieve killing from constituting manslaughter, if act is made misdemeanor by statute.

Homicide—One Purposely Pointing Gun at Another Without Intent
to Kill is Guilty of Manslaughter, Where Gun is Unintentionally
Discharged and Kills Victim (Laws 1925, p. 172).

18. Under Laws of 1925, page 172, and similar statutes, one pur-
posely pointing gun at another within shooting distance, not in
self-defense, without intention to take life or do bodily harm, is
guilty of manslaughter, where gun is unintentionally discharged and
kills victim.

Criminal Law—Charge That Defendant had No Right to Use Force
to Prevent Stealing of Melons Worth Less Than $35 Held not
Error, When Read With Reference to Whole Charge and Evi-
dence.

19. In murder trial, charge that stealing or attempting to steal
melons of no greater value than $35 is not a felony, and that de-
fendant had no right to use force to prevent stealing of melons
worth less than $35, *held* not error when read with reference to
whole charge and evidence, though erroneous when taken alone.

Criminal Law—Charges are not Erroneous Because Excerpts Contain
Incomplete Statements of Law.

20. Charges to juries are not to be condemned because mere
excerpts therefrom contain incomplete statements of law.

Homicide—Such Force as Reasonably Prudent Man Would Deem
Necessary in Like Circumstances may be Used to Prevent
Trespass on Property.

21. It is lawful to use such force as may seem necessary to
prevent trespass on property, governed by standard of what reason-
ably prudent man would do in like circumstances.

Homicide—Abstract Instructions on Self-defense are not Reversible
Error.

22. Conviction of homicide will not be reversed on grounds of
error in giving of abstract instructions on self-defense.

Homicide—Instructions on Excusable Homicide Held not Reversible
Error.

23. Conviction will not be reversed because of instructions on
excusable homicide.

•

———————

Assault and Battery, 5 C. J., p. 743, n. 80.

Criminal Law, 16 C. J., p. 58, n. 84, p. 1035, n. 50, 51, p. 1041,
n. 12, 13, 14, p. 1042, n. 16; p. 1049, n. 82, p. 1050, n. 84, p. 1063,
n. 85, p. 1068, n. 3; 17 C. J., p. 342, n. 94, 95.

Homicide, 29 C. J., p. 1049, n. 2, 11, p. 1103, n. 31, p. 1122, n. 39,
p. 1124, n. 47, p. 1125, n. 73, 74, p. 1148, n. 36, p. 1149, n. 37,
p. 1152, n. 76, p. 1153, n. 87, p. 1156, n. 19, p. 1161, n. 76 New; 30
C. J., p. 87, n. 9, 23, p. 88, n. 30, p. 309, n. 22, p. 336, n. 70, p. 357,
n. 4, p. 364, n. 83, p. 393, n. 95, p. 450, n. 18.

Indictment and Information, 31 C. J., p. 857, n. 86, 87, p. 858,
n. 88, 91, 92, 93, 2, 3.

*Malum in se*, 38 C. J., p. 520, n. 46.

Toward, 38 Cyc., p. 591, n. 1.

Weapons, 40 Cyc., p. 871, n. 69.

From Yamhill: W. M. RAMSEY, Judge.

In Banc.

This is an appeal from a judgment of conviction of the crime of manslaughter.

Frank Eugene Hamlin, a truck driver, 49 years of age, resided in Portland, Oregon, with his two sons, George Oscar, 27, and Earl, 25 years old, both of whom were automobile mechanics. William Hamlin, a nephew of Frank Eugene, 40 years of age, resided at Oregon City. On September 15, 1925, these four men assembled their supplies and equipment at the Hamlin home in Portland, loaded the same into a Chevrolet touring car, and, at 7:30 p. m., started for Tillamook. George Hamlin drove the car. Earl sat in the front seat on George's right. Their father sat on the right-hand side of the rear seat, with his nephew, William, on his left. These respective positions were maintained until the trip was suddenly terminated by the unfortunate tragedy involved herein. When they reached a point on the McMinnville-Sheridan highway about two miles southwest of McMinnville, they stopped their car on the right-hand side of the road, about 125 yards from the residence of the defendant, and somewhere between 25 and 40 feet from a gateway opening into a melon patch belonging to James S. Trent, the defendant herein.

The story of the State is, in effect, as follows:

At the point above indicated, the Hamlins stopped their car to answer a call of nature, and Frank Eugene (the father of two of the boys) suggested that they fix the spotlight before starting on. In pursuance thereof they lighted a lantern, which was in use for about ten minutes, or while they were repairing the spotlight. After repairing the light, they

again took their seats in the car in the relative positions hereinbefore described. As the car started, however, they heard a slight explosion, which they suspected was a blow-out. They stopped to investigate, and, upon satisfying themselves that the tires were all right, they again started. They had gone but a few feet when there was a loud explosion, and George Oscar Hamlin exclaimed: "I am shot; I am done for," and fell over against his brother Earl. At the same time, their father said: "I am paralyzed." Thereupon, Earl stopped the car, and, at the suggestion of his cousin William, pulled George over, took the driver's seat, turned the car around and drove back to McMinnville, where they carried the wounded men into a hospital. Within thirty minutes after reaching the hospital, George died from the effects of gunshot wounds.

Dr. Cook, who was called into the case, thus describes the wounds:

"Well, there were four wounds, one through the neck, left side, a glancing wound on the left shoulder, and then a wound on either side of the spine just below the shoulder blade."

Dr. Reitzel testified that the wounds that caused the death of George "were wounds through the chest; bullets that entered the back about the fifth or sixth interspace and passed forward and lodged under the skin over about the fourth interspace."

After the men reached the hospital, the car was examined by Deputy Sheriff Mead and others, who discovered twelve buckshot holes in the back of the car toward the right-hand corner, and one shot in the lower left-hand corner of the windshield. When the sheriff and other officers of the county went to

122 Or.—29

the scene of the shooting, the sheriff went to the defendant's home near by and spoke to the defendant, who was sleeping on the front porch, whereupon, according to the defendant's testimony, the following conversation was had:

"Q. And what did he say? A. Well, he come around there in front of the bed where Etter and I was and sat on the banister—on the banister of the porch—and called me and asked if there had been anyone around my watermelon patch that night, and I said I didn't think so.

"Q. Well, now, did you think so at that time? Did you think there had been someone around your watermelon patch that night? A. Yes, I was sure there had been at that time."

The sheriff testified that the defendant and his wife first denied that they had heard any shooting there that night, but that, when, upon his third visit to the house, he informed the defendant that somebody had been shot there that night and that one man was dead and another would die, the defendant immediately responded:

"Well, George, if that be a fact, I did shoot out there tonight. There was some people in my melon patch, or I thought there was."

The sheriff also testified that, after admitting the shooting, the defendant accompanied the officers and showed them the route he had followed from the house to the gate of the melon patch, and pointed out to them the place where he had stood when he fired the two shots.

The defendant claims that, on the night of the shooting, the Hamlins stopped on the highway to steal watermelons. As tending to corroborate his assertion, he points to the fact that, about four weeks after the shooting he found, near the field fence, at

a point between the melon patch and McMinnville, a sack containing a few broken melons, a red bandanna handkerchief and a piece of paper bearing the signature of George Hamlin. William and Earl Hamlin, however, testified that none of them were in the melon patch, that they had no melons in the car, and that their only purpose in stopping was as hereinbefore stated. Defendant told the officers, among other things, that, on the night in question, Mrs. John Arp, a near neighbor, seeing the lights of the automobile on the highway near the melon patch, and thinking that somebody was after melons, telephoned him that he "had better watch his melon patch"; that he thereupon dressed, took his single-barreled shotgun, picked up two shells that he thought were loaded with wheat or rice, and started out toward his melon patch in the hope of surprising the trespassers; that, when he got about 50 or 60 yards from a gate opening into the melon patch, he heard it rattle. We will now let the defendant tell his own story, as given from the witness-stand:

"About the time the gate rattled, the car door slammed and slammed hard, and they speeded their motor up, all just that quick (indicating by snapping fingers). Of course it wasn't that quick, but just about as quick as it could be done, and I run up to where I could see and thought I would shoot *in the direction of the car* and down where I thought I wouldn't hit anyone. I didn't even think about hurting anybody, even if I did shoot them, for I thought it was rice in there.

"Q. Well, what was your purpose in shooting at all there? A. Well, I aimed to scare the boys. I thought they was going to get away, then when I shot the shell it didn't make no racket much. Oh, just a little racket, but an awful long streak of fire from it, and I thought the boys must have spilled the

powder and it didn't make any racket. By that time, the car had got down the hill quite a way. The gun I had—I had to pull the cartridge out with my fingers, and I thought, 'Shall I shoot again or not?' And I thinks, 'I have got them in here this time and they don't know it,' and I thought, 'May be I had better shoot again and may be the next will make a little more racket. *Then I shot in the direction of the car again.*"

We take the following excerpt from the bill of exceptions:

"The defendant further testified that he thought the occupants of this car had been trespassing upon his land, and he did not know but that they were Kelly Davidson or some neighbor boys; that he had no intent to shoot at or towards any person, and no intent to do any person any bodily harm whatsoever; that he honestly believed the shells to be loaded with harmless substance, and that he shot solely for the purpose of frightening the trespassers away, and for no other purpose; that, when he fired the second shot *he pointed it toward the lower part or back wheels of the automobile* and the pavement upon which they stood, and not at the upper part of the car, the back of which car was turned toward him."

The defendant was indicted by the grand jury of Yamhill County, Oregon, for murder in the second degree. He entered a plea of not guilty, was tried and convicted of manslaughter, sentenced to imprisonment in the penitentiary for a term of seven years, and fined $500. From the judgment of conviction, he appeals.                           AFFIRMED.

For appellant there was brief over the names of *Messrs. Vinton & Tooze* and *Mr. Eugene Marsh,* with an oral argument by *Mr. Walter L. Tooze, Jr.*

For respondent there was a brief and oral arguments by *Mr. Earl A. Nott,* District Attorney, and *Mr. George Mowry,* Special Assistant Attorney General.

BROWN, J.—1. Does the indictment in this case include a charge of involuntary manslaughter?

Homicide is the slaying of one human being by the act, procurement or omission of another: *Commonwealth* v. *Webster,* 5 Cush. (Mass.) 295 (52 Am. Dec. 711).

1 Wharton's Criminal Law (11 ed.), Section 417, says:

"Homicide is divided into the following heads:
"I.   Murder.
"II.   Manslaughter.
"III.   Excusable homicide.
"IV.   Justifiable homicide." See, also, Or. L., §§ 1893–1910.

In this state, murder is divided into two degrees. Manslaughter is not a degree of murder, but is usually treated as a degree of homicide. In this jurisdiction, unlike many others, the crime of manslaughter is not divided into degrees. Blackstone defines it as the unlawful killing of another, without malice either express or implied: 4 Blackstone's Commentaries, 190. Again, the Code of Indiana sets out the following definition:

"Whoever unlawfully kills any human being without malice, express or implied, either voluntarily, upon a sudden heat, or involuntarily, but in the commission of some unlawful act, is guilty of manslaughter." 1 Burns' Annotated Indiana Statutes, § 2416.

The Supreme Court of Indiana says that this language is adopted bodily from the common law: *Dunville* v. *State,* 188 Ind. 373 (123 N. E. 689).

For a further definition of voluntary and involuntary manslaughter, as known to the common law and enacted into statutory law by our Code, see Archbold's Criminal Pleading (24 ed.), p. 875.

2. We have no common-law crimes in Oregon. However, our Legislative Assembly has denounced as crimes many of the offenses known to the common law. Our Code, at Sections 1897 and 1898, defines voluntary and involuntary manslaughter. Unquestionably the legislature, in enacting these sections, intended to adopt the common-law meaning of the words used therein: *Dunville* v. *State, supra.* Under the common law, manslaughter was regarded as a degree of homicide, and a defendant charged with murder, either in the first or second degree, could be convicted of either voluntary or involuntary manslaughter: 2 Russell on Crimes, p. 1805; Archbold's Criminal Pleading, pp. 228, 871; 1 Roscoe's Criminal Evidence, p. 83. The proposition that involuntary manslaughter is included in an indictment for murder has been passed upon in this jurisdiction a number of times, and our court has uniformly adhered to the common-law doctrine that manslaughter, as defined by the above sections, is a degree of homicide: See *State* v. *Grant,* 7 Or. 414; *State* v. *Ellsworth,* 30 Or. 145 (47 Pac. 199); *State* v. *Setsor,* 61 Or. 90 (119 Pac. 346); *State* v. *Farnam,* 82 Or. 211 (161 Pac. 417, Ann. Cas. 1918A, 318); *State* v. *Clark,* 99 Or. 629 (196 Pac. 360).

In the case of *State* v. *Setsor, supra,* the defendant was indicted for the crime of murder in the first degree. He pleaded not guilty, was tried and convicted, the jury returning into court the following verdict:

"We, the jury duly impaneled to try the above entitled cause, find the defendant * * guilty of involuntary manslaughter."

On appeal to this court, that verdict was upheld.

In *State* v. *Farnam, supra,* the court quoted with approval the following from *People* v. *Pearne,* 118 Cal. 154 (50 Pac. 376):

"It has always been held that, upon an indictment charging murder, a conviction for manslaughter was proper. In other words, when an indictment charges murder, it also charges manslaughter. An indictment laid for murder charges an intentional killing; yet, under the criminal practice and procedure in this state, there is no doubt but that a verdict of involuntary manslaughter would find support in such a pleading. This is so because involuntary manslaughter is the 'unlawful killing of a human being,' and such crime is always included in * * murder."

Now, adverting to authorities in other jurisdictions: A leading case is that of *State* v. *Averill,* 85 Vt. 115 (81 Atl. 461, Ann. Cas. 1914B, p. 1005), where the Vermont court, in an illuminating opinion, wrote:

"That both voluntary and involuntary manslaughter are included in the crime of murder, and a person indicted for murder may be convicted of murder or of either species of manslaughter, as the evidence may warrant, at common law, is held in the following cases in this country: *Conner* v. *Commonwealth,* 13 Bush (Ky.), 714; *Buckner* v. *Commonwealth,* 14 Bush (Ky.), 601; *Bush* v. *Commonwealth,* 78 Ky. 268; *Powers* v. *State,* 87 Ind. 144; *Pigg* v. *State,* 145 Ind. 560 (43 N. E. 309); *Watson* v. *State,* 116 Ga. 607 (43 S. E. 32, 21 L. R. A. (N. S.), 1); *Thomas* v. *State,* 121 Ga. 331 (49 S. E. 273); *In re Somers,* 31 Nev. 531 (103 Pac. 1073, 135 Am. St. Rep. 700, 24 L. R. A. (N. S.), 504)."

In a valuable note to the case, the annotator says:

"The rule laid down in the reported case that a person indicted for murder may be convicted of involuntary manslaughter, seems to have the general support of the authorities."

Then follows an extensive list of decisions.

In support of this doctrine, see 12 Stand. Ency. of Proced., pp. 587–591. To the same effect is Wharton on Homicide, § 653; Wharton's Criminal Law, § 675. 31 C. J., pp. 857, 858, announces the rule in the following language:

"Since an indictment for murder includes all the lower grades of felonious homicide, under a common-law form of indictment, a conviction may be had for either of the degrees of murder as defined by statute or of the lower grades of homicide. So upon an indictment charging murder generally a defendant may be found guilty of manslaughter, and, where manslaughter has been divided by statute into degrees, of any of the statutory degrees. * * It is also held that there may be a conviction for negligent homicide, voluntary manslaughter, or involuntary manslaughter. * * Where the indictment is for the second degree, a conviction of manslaughter may be had, including the lower degrees of manslaughter."

So by the great weight of authority, a person indicted for murder may be convicted of any one of the lower degrees of homicide.

3. The defendant contends that the indictment fails to inform him of the nature of the charge he is compelled to meet as guaranteed by Section 11, Article 1, Oregon Constitution. The indictment informed the defendant that he was charged with the unlawful and felonious killing of George Oscar Hamlin, a human being, by shooting him to death with a gun. Obviously, this information afforded him ample notice of the nature and cause of the accusation against him. He is not in a position to complain that he has been

found guilty of a lower degree of homicide than murder. To illustrate: An indictment for murder in the first degree accuses the defendant of deliberate and premeditated malice; yet, under such an indictment, he can be convicted of voluntary manslaughter, of which the element of malice is not an ingredient.

A few cases, among them *Bruner* v. *State,* 58 Ind. 159, are cited as authority for the proposition that a conviction of involuntary manslaughter may not be had unless the indictment distinctly charges that degree of the offense. Bruner was not tried upon an indictment for murder, but for manslaughter, and the Supreme Court held that an indictment for voluntary manslaughter would not support a conviction of involuntary manslaughter, and *vice versa.* See, also, *Adams* v. *State,* 65 Ind. 565. However, that same court has held in subsequent cases that an indictment for murder is sufficient to sustain convictions for involuntary manslaughter: *Powers* v. *State,* 87 Ind. 144; *Pigg* v. *State,* 145 Ind. 560 (43 N. E. 309).

Another case often cited in support of the doctrine that a conviction of involuntary manslaughter may not be had unless the indictment distinctly charges that degree of the offense is *Walters* v. *Commonwealth,* 44 Pa. 135. In that case, the court said:

"When the officers of the commonwealth shall be of opinion that a homicide is but manslaughter, and the degree is doubtful, the statute allows an indictment charging the offense both as voluntary and involuntary, or either. But it is necessary, in order to sustain a conviction for involuntary manslaughter, that it be distinctly charged as such. Since the case of *Commonwealth* v. *Gable* (7 S. & R. (Pa.) 423), it must be charged as a misdemeanor, and is therefore not proper to form a count in an indictment for felonious homicide, excepting in the case of an indictment for voluntary manslaughter, where it may be joined by force of the statute."

Again, in *Commonwealth* v. *Bilderback,* 2 Pars. Eq. Cas. (Pa.) 447, the defendants were indicted for homicide in negligently upsetting a small boat, thereby causing one of the occupants to be drowned. In its disposition of the case, the court held that, under such an indictment, they could not be convicted of involuntary manslaughter, for the reason that that offense was a misdemeanor and there could be no conviction therefor under an indictment charging a felony alone.

While the cases just alluded to are often cited as authority for the contention that an indictment for murder does not include a charge of involuntary manslaughter, we are committed to the doctrine supported by the overwhelming weight of authority, that a valid indictment for murder includes both voluntary and involuntary manslaughter.

4. Section 1925, Or. L., as amended by Chapter 117, General Laws of Oregon, 1925, reads:

"It shall be unlawful for any person over the age of twelve years, with or without malice, purposely to point or aim any pistol, gun, revolver or other firearm, within range of said firearm, either loaded or empty, at or toward any other person, except in self-defense."

From an elaborate note on "Homicide in the Commission of an Unlawful Act," found in 63 L. R. A., at page 387, we take the following excerpt:

"Where a statute makes it a misdemeanor for any person to present at another any gun, pistol or other firearm, whether loaded or unloaded, and one intentionally points a gun or pistol at another, though without any intention whatever to take life, and by accident it is discharged, producing death, he is guilty of manslaughter committed in the performance of an unlawful act: *Barnes* v. *State,* 134 Ala. 36 (32 So.

670); *Henderson* v. *State,* 98 Ala. 35 (13 So. 146); *State* v. *Goodley,* 9 Houst. (Del.) 484 (33 Atl. 226); *State* v. *Grote,* 109 Mo. 345 (19 S. W. 93); *Surber* v. *State,* 99 Ind. 71; *State* v. *Tippett,* 94 Iowa, 646 (63 N. W. 445); *State* v. *Morrison,* 104 Mo. 638 (16 S. W. 492); *Ford* v. *State,* 71 Neb. 240 (98 N. W. 807, 115 Am. St. Rep. 591).''

In *State* v. *Justus,* 11 Or. 178 (8 Pac. 337, 50 Am. Rep. 470), Mr. Justice LORD, speaking for this court, approved the following doctrine announced in the leading case of *State* v. *Hardie,* 47 Iowa, 647 (29 Am. Rep. 496, 2 Am. Crim. Rep. 326):

''If one uses a dangerous and deadly weapon in a careless and reckless manner, whereby another is killed, the party so using the dangerous weapon is guilty of manslaughter, even though no harm in fact is intended.''

In *State* v. *Hardie, supra,* the revolver used by the defendant was found in the road by one Gantz, defendant's brother-in-law, about five years prior to the happening of the accident. Repeated attempts failed to discharge it or to remove the load. Believing the revolver to be harmless, they laid it away in this condition, and in this condition it remained, no other load having been put into it. On the day of the accident Hardie, the defendant, with the idea of frightening a woman, pointed the gun at her and pulled the trigger, with the result that the revolver was discharged and the woman killed. On trial he was convicted of manslaughter, and on appeal the charge of the court to the jury announcing the principle approved in *State* v. *Justus, supra,* was sustained.

In *State* v. *Vance,* 17 Iowa, 138, the defendant, learning that some boys were stealing his melons, rushed out to his garden and fired a gun, killing one of the trespassers. The court held, on appeal, that,

if the killing was the result of pure accident and
there was no purpose to injure, or aim in the direc-
tion of, any person, it was excusable; but that, if the
gun was discharged recklessly or heedlessly, the act
would be at least manslaughter, although the gun was
pointed in the direction of the deceased by accident,
with no intention to injure.

1 Wharton's Criminal Law (11 ed.), Section 426,
defines involuntary manslaughter as follows:

"Involuntary manslaughter, according to the old
writers, is where death results unintentionally so far
as the defendant is concerned, from an unlawful act
on his part, not amounting to felony, or from a lawful
act negligently performed. Hence it is involuntary
manslaughter where the death of another occurs
through the defendant's negligent use of dangerous
agencies."

In *Harding* v. *State*, 26 Ariz. 334, 225 Pac. 482,
the defendant was a peace officer, and, while attempt-
ing to arrest a drunken automobile driver, shot at a
tire to disable the car and unintentionally killed the
driver. On appeal the Supreme Court held that, in
view of Penal Code of 1913, Sections 175, 1046, the
defendant was guilty of the crime of involuntary
manslaughter.

To the effect that the careless shooting or handling
of firearms may be manslaughter, see *Reg.* v. *Weston*,
14 Cox C. C. 346; *Reg.* v. *Jones*, 12 Cox C. C. 628;
*State* v. *Warner*, 157 Iowa, 111 (137 N. W. 466); 2
Cyclopedia Criminal Law (Brill), § 671, and authori-
ties under note 23; 21 Am. & Eng. Ency. of Law
(2 ed.), pp. 191, 192.

5 A. L. R. 603, contains a valuable note on homicide
by wanton or reckless use of firearms without express
intent to inflict injury. At page 610 thereof, the
editors say:

"In general, every unintentional killing of a human being arising from a wanton or reckless use of firearms, in the absence of intent to discharge the weapon, or in the belief that it is not loaded, and under circumstances not evincing a heart devoid of a sense of social duty, is manslaughter. In some cases the courts have designated the offense as 'manslaughter,' without drawing the distinction of the common-law writers between voluntary and involuntary manslaughter (citations)."

For a note supplementing the above, see 23 A. L. R. 1554.

5. The defendant asserts that the court erred in refusing to give certain instructions requested by him. A case directly in point on this issue is *State* v. *Selby*, 73 Or. 378 (144 Pac. 657), and in its ruling thereon the court said:

"We have examined the instructions that were given. They are lengthy, and properly cover every issue in the case. We find that they were fair to the defendant. When the trial court covers properly every issue in the case with the instructions that are given, it is not error to refuse to give additional charges requested by the parties, although they state the law correctly. The trial judge has a right to charge the jury in his own language, and, if he instructs properly on every issue, he need not give charges requested by the parties."

On this issue, the facts in the above case are identical with the facts in the case before us, and we are satisfied with the holding of the court therein. Moreover, it is the better practice to make the instructions as short and pointed as is consistent with clearness, for "voluminous instructions tend to uncertainty, and lose the jury and the issue": *Thatcher* v. *Quirk*, 4 Idaho, 267 (38 Pac. 652).

6. At the request of the prosecution, the court charged the jury with reference to defendant's right to use force for the purpose of regaining possession of stolen property. This instruction was in direct violation of the rule that instructions should be limited to the issue and based on the evidence in the case.

The defendant vigorously contends that the court misstated his theory of the case by instructing the jury that defendant claimed young Hamlin was shot while in the melon patch, and that the court erroneously charged the jury by giving abstract instructions at length upon the right of the defendant to shoot in defense of his property: Or. L., § 1909. The evidence proves beyond peradventure that young Hamlin was on the public highway when he and his father were shot and mortally wounded. Neither the defendant nor any other witness pretends to say that George Oscar Hamlin was engaged in the commission of a crime at the time the defendant with fatal execution pointed and discharged his gun loaded with powder and buckshot in the direction of the moving automobile.

In a number of cases, this court has held that the giving of abstract instructions, although correctly stating the law, is error: *Morris* v. *Perkins,* 6 Or. 350. This is so because such instructions tend to confuse the jury by drawing their attention to matters not in issue. As to the treatment of the error, a case directly in point, and in harmony with our view, is that of *Davis* v. *Commonwealth,* 193 Ky. 597 (237 S. W. 24, 23 A. L. R. 1551), where Mr. Chief Justice HURT, of the Kentucky Court of Appeals, in discussing abstract instructions with relation to a given case, held that such an instruction "could only tend

to minimize the case of the prosecution,'' and was harmless.

That a case will not be reversed where it is evident that the instruction complained of as abstract did not bring about an improper verdict, see 2 R. C. L., Appeal and Error, Sections 209, 210, where the editors say:

"This doctrine obviously is founded in common sense."

We have carefully considered all of the assignments of error. From such consideration, we are satisfied that the defendant received a fair and impartial trial, and that this case should be affirmed. It is so ordered.                                    AFFIRMED.

BELT, J., absent.

---

Rehearing denied, September 27, 1927.

ON PETITION FOR REHEARING.

(259 Pac. 893.)

For the petition, *Messrs. Vinton & Tooze* and *Mr. Eugene Marsh.*

No appearance *contra.*

BROWN, J.—7. The defendant has filed a petition for rehearing. For a complete statement of the facts, which must be read in order properly to understand this opinion, see our original opinion filed February 8, 1927, *ante,* p. 444 (252 Pac. 975). Counsel for defendant assert:

"All the facts were practically admitted. The only defense defendant had was that of excusable homicide; that of accidental killing. That defense was not submitted." Brief on Rehearing, p. 27.

Had the record disclosed any testimony tending to establish that defense, it should have been submitted to the jury. Hereafter in this opinion we will quote from the instructions of the court.

Every slaying of a human being is unlawful, unless excused or justified by law: Or. L., § 1902.

The defendant expressly repudiates the defense of justifiable homicide as defined by our Code, but asserts that the homicide was excusable.

"The killing of a human being is excusable when committed,—

"1. By accident or misfortune in lawfully correcting a child or servant, or in doing any other lawful act, by lawful means, with usual and ordinary caution, and without any unlawful intent; or,

"2. By accident or misfortune in the heat of passion, upon a sudden and sufficient provocation, or upon a sudden combat, without premeditation or undue advantage being taken, and without any dangerous weapon or thing being used, and not done in a cruel or unusual manner." Or. L., § 1910.

The fact that the defendant admits that he used a dangerous weapon, i. e., a shotgun loaded with powder and leaden bullets, in the commission of the homicide, of necessity eliminates from our consideration the second paragraph of the foregoing section. A review of the evidence as given by defendant, if believed by the jury, might likewise eliminate paragraph 1. The defendant does not pretend that he was either correcting a child or a servant, or that he was, at the moment he fired the fatal shot, engaged in "any other lawful act by lawful means."

8. There is no question but what the deceased was in the public highway when he was shot. He and his father, brother and cousin were on their way from Portland to Tillamook. According to their version,

they had stopped on the highway for lawful purposes, and, before continuing on their way, they lighted a lantern and repaired the lights of the automobile in which they were traveling. This took them about ten minutes; and when they resumed their journey the shooting took place. The defendant admitted the shooting, but claimed that he thought his gun was loaded with wheat or rice, and said he fired the shot to scare the men, who he believed had halted on the highway for the purpose of going into his water-melon patch and stealing melons. He testified that a neighbor, seeing the lights on the highway near his house, telephoned him that he "had better watch his melon patch"; that he dressed, took his shotgun, and two shells that he believed were loaded with wheat or rice, and directed his footsteps to his melon patch in the hope of surprising the alleged trespassers, and that, when he got within 50 or 60 yards of a gate opening into the melon patch, he heard the gate rattle. He continues thus:

"About the time the gate rattled, the car door slammed, * * and they speeded their motor up * * and I run up to where I could see and thought I would shoot in the direction of the car and down where I thought I wouldn't hit anyone. I didn't even think about hurting anybody, even if I did shoot them, for I thought it was rice in there.

"Q. Well, what was your purpose in shooting at all there? A. Well, I aimed to scare the boys. I thought they was going to get away. Then when I shot the shell it didn't make no racket much. * * And I thought the boys must have spilled the powder. * * By that time, the car had got down the hill quite a way. The gun I had—I had to pull the cartridge out with my fingers, and I thought, 'Shall I shoot again or not?' and I thinks, 'I have got them in here this time and they don't know it,' and I thought,

122 Or.—30

'Maybe I had better shoot again and maybe the next time it will make a little more racket.' *Then I shot in the direction of the car again.*"

The following excerpt is taken from the bill of exceptions:

"The defendant further testified * * that, when he fired the second shot, he pointed it toward the lower part or back wheels of the automobile and the pavement upon which they stood, and not at the upper part of the car, the back of which car was turned toward him."

There is no testimony other than pointed out in this or in the former opinion even tending to show that the deceased was ever on the defendant's premises or in his melon patch. When the defendant fired the fatal shot the motor car, with its occupants, had moved some distance on the highway from where it was when he first observed it; and when he pointed his gun in that direction, his act was in direct violation of Section 1925, Or. L., which denounces as a misdemeanor the pointing of a gun toward another person except in self-defense.

A homicide by accident or misfortune, under the Code, is the accidental killing of another when the slayer is performing a lawful act, unaccompanied by any criminal, careless or reckless conduct, and is frequently called homicide by misadventure. Now, what meaning attaches to the term "misadventure" in its treatment by leading text-writers?

"Misadventure, when applied to homicide, is the act of a man who, in the performance of a lawful act, without any intention to do harm, after using proper precautions to avoid danger, unfortunately kills a person." Note, 3 L. R. A. (N. S.), p. 1153.

"So, if a killing resulted from the act of the slayer of unlawfully pointing a firearm at the person killed,

the killing is not misadventure: *Barnes* v. *State*, 134 Ala. 36 (32 So. 670); *Johnson* v. *State*, 94 Ala. 35 (10 So. 667); *State* v. *Dugan,* Houst. Crim. Rep. (Del.) 563; *Murphy* v. *Commonwealth,* 15 Ky. Law Rep. 215 (22 S. W. 649); *Williamson* v. *State,* 2 Ohio C. C. 292." Note, 3 L. R. A. (N. S.), p. 1156.

In his work on Homicide, Wharton says:

"To constitute the defense of misadventure in homicide, three requisites exist: First, there must have been no intention to do harm; second, proper precaution must have been taken to avoid mischief; and third, the act from which death resulted must have been lawful." Section 355.

Then, at Section 358, the author repeats the general rule announced by the text-writers and courts, to the effect that, if the homicide was the result of an act of the slayer in unlawfully pointing a firearm at the person killed, the killing is not by misadventure.

Now, what constitutes involuntary manslaughter? 29 C. J., Section 134, Homicide, thus defines this term:

"Involuntary manslaughter consists in the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty. The unlawfulness of the act in connection with which the killing occurs is the element which distinguishes involuntary manslaughter from a killing excusable as by accident or misfortune."

At Section 138 of that work, the rule that the accidental killing of another in doing an unlawful act constitutes manslaughter is held to apply to unintentional homicide occasioned by the unlawful shooting, pointing, or handling of firearms.

Again, from 13 R. C. L., Homicide, Section 149, we quote:

"Involuntary manslaughter includes all such killings as result unintentionally from the commission of unlawful nonfelonious acts, or the negligent performance of acts which are not unlawful *per se.*"

To the same effect is 1 Wharton's Criminal Law (11 ed.), Section 426.

2 Bishop on Criminal Law declares it to be manslaughter when the firing of a gun intended simply to frighten another results in death, "or, when one carelessly discharges firearms into a street." See, also, Clark's Criminal Law, § 76; 21 Am. & Eng. Ency. of Law (2 ed.), 191, 192; 2 Cyc. Crim. Law, § 671. For additional authorities, see our original opinion.

Clearly, the act of defendant in shooting Hamlin in the back while he was lawfully driving upon the public highway was not a slaying by accident or misfortune while doing a "lawful act by lawful means." Or. L., § 1910.

9. The defendant asserts that there is a marked difference between excusable homicide and justifiable homicide.

As this court held in *State* v. *Gray*, 46 Or. 24, 31 (79 Pac. 53), the terms "justifiable" and "excusable" homicide are often used as synonymous in the books. Again, in his work on Homicide, Wharton says, at Section 9, concerning the distinction between excusable and justifiable homicide:

"The distinction, in result, between justifiable and excusable homicide is now practically exploded. In former times, in the latter case, as the law presumed that the slayer was not wholly free from blame, he was punished, at least by forfeiture of goods. But in this country such a rule is not known ever to have been recognized. * * "

10. The trial court instructed the jury:

"If you find from the evidence, beyond a reasonable doubt, that the deceased, or those with him when he was shot by the defendant, were stealing, or attempting to steal, melons in defendant's melon patch, and that the melons that they stole, or were attempting to steal, were of less value than $35, and that the defendant shot the deceased in attempting to defend his melons from being stolen, then I charge you that the defendant, in shooting the deceased, was doing an unlawful act, and was guilty of manslaughter in killing the deceased."

Defendant asserts that the foregoing instruction was abstract and prejudicial to him. In his brief, he says:

"There never was any contention in the case at bar that a felony was being committed, or even attempted, nor even that anyone was in the melon patch when the shooting was done. * *

"There was evidence in this case tending to show that the defendant believed that someone had been in his melon patch that evening, and that someone had phoned to him and said, 'guard your melons,' or words to that effect, and that he went out into the melon patch with his shotgun and two shells loaded, as he supposed, with harmless material. He heard the rattle of the gate, heard the engine of the car start, and he fired twice on the ground toward the machine, solely for the purpose of frightening. Now there was no evidence to justify the instructions above, and how can the court say that they had no effect upon the jury's mind and were therefore harmless?"

11. The law is accurately stated at Section 718bb, 30 C. J., in language following:

"The giving of either a correct or erroneous instruction on self-defense is harmless and not ground for disturbing a conviction where accused does not

claim self-defense or where there is no evidence to warrant an acquittal on the ground of self-defense.''

See the numerous cases in the notes cited in support of the foregoing statement.

Dr. Wharton lays down the rule that, where the evidence in a case of homicide shows guilt either of murder or manslaughter, an instruction on the law of self-defense should not be given; nor should one be given in an abstract case, ''though in such a case the accused cannot complain of an error in an instruction or in instructing as to self-defense.'' Wharton on Homicide (3 ed.), § 222. This proposition is supported by numerous authorities in other jurisdictions. However, it is unnecessary for us to go abroad for authoritative support. In *State* v. *Doherty,* 52 Or. 591 (98 Pac. 152), a case where the defendant was convicted of murder in the second degree, for shooting and killing one Oscar Allen, this court held:

''One convicted of murder cannot complain of errors in an instruction on self-defense, when the evidence did not raise that issue.'' Syl., Point 9.

Again, in *State* v. *Holbrook,* 98 Or. 43 (188 Pac. 947, 192 Pac. 640, 193 Pac. 434), this court, speaking through Mr. Justice Burnett, held that the instruction on justifiable homicide was harmless and not ground for reversal on appeal, for the reason that it was favorable to defendants. Among other things, the learned justice wrote:

''In any event, the instruction could not have been harmful to them, because it provided for them another avenue of escape from the charge in the indictment.''

This applies alike to the other instructions on justifiable homicide.

The defendant complains about the refusal of the court to give certain requested instructions. The following instruction given by the court was requested by the defendant:

"There is no dispute in this case but that the deceased met his death as a result of wounds inflicted from buckshot fired from a gun in the hands of the defendant Trent. The theory of the defendant in this case is, that unknown persons had been stealing melons from his melon field, and upon the night in question he believed that the deceased and his associates were engaged in stealing watermelons from his melon field. He contends that he had directed certain shotgun shells to be loaded with wheat, which he believed to be harmless, and that, upon the night in question, he took those shells, believing the same to be loaded with wheat or some other harmless substance, and proceeded to the watermelon patch with a single-barreled shotgun, intending to shoot in the general direction of the persons whom he believed to be stealing watermelons from his field, with the sole purpose of scaring and frightening them out of his melon field, and to prevent them from further trespassing upon his premises, and that he had no intent to harm or do any bodily injury to any person."

The following instructions were given in lieu of instructions requested by the defendant involving the question of due care:

"The jury is further instructed, as a matter of law, that if the defendant Trent shot with the sole purpose of frightening the supposed trespassers, and with no intent to do bodily harm, and with the same degree of care that a prudent man would exercise under like circumstances, and he honestly believed, or if the evidence in that respect raises a reasonable doubt in your mind, that said gun was loaded with wheat or some other harmless material, and would not do anybody any harm or injury, then for the pur-

pose of this case the jury should treat the situation exactly the same as though the shells in question had actually been loaded with wheat, as the defendant honestly believed them to be; provided, of course, that, in this, the defendant exercised due care; and the mere fact that one of the shells, or both, turned out to be loaded with buckshot would not change the situation in any respect. It is not incumbent upon the part of the defendant to establish to your satisfaction that he honestly believed the shells to be loaded with wheat or other harmless substance, or that he had no intent to do bodily harm, but it is only necessary that a reasonable doubt be raised in your mind upon the case as a whole, as to his ultimate guilt, in order to entitle him to a verdict of acquittal at your hands.

"In judging the question of whether or not the defendant exercised due care in ascertaining whether or not the shells which he used were loaded with buckshot, or wheat or other harmless substance, you must judge his conduct in the light of the facts and the circumstances surrounding him at the time and place in question, and not in the light of subsequent events. In other words, his conduct is to be judged by the facts and circumstances then existing, and by measuring it with that of a reasonably prudent man in like circumstances."

In the course of the deliberations of the jury, the foreman submitted to the court the following inquiry:

"If this defendant had used due diligence in knowing what was in those cartridges, could we find a verdict for manslaughter or second degree murder? We didn't understand that point in the law exactly."

In response thereto, and based upon the statute denouncing the pointing of firearms at another, the court charged:

"If the defendant pointed a gun at the deceased, and was within shooting distance of him, and the gun was fired, and hit the deceased, and killed him, in my

judgment that constitutes manslaughter, even though he exercised diligence in attempting to load it with shot that would not kill anyone; it would not make any difference whether the gun was loaded with buckshot or any other kind of shot, if he pointed it at him intentionally and purposely, and within shooting distance, and caused the gun to go off and to shoot and kill him, in my judgment he is guilty of manslaughter. The statute provides expressly that if a person over the age of twelve years points a gun at another or towards him, and within shooting distance, it is a misdemeanor, and an unlawful act.''

12. After the above charge, the foreman submitted another inquiry, as follows:

''That is not just the question. But the question is this: Should he have known exactly what was in that cartridge before he pointed the gun—whether it was buckshot or not?

''The Court: What?

''Foreman: Whether he should have known what was in the cartridge before he pointed the gun?

''The Court: It was his duty to use such care as a reasonable man would use under circumstances of that kind, so as not to get the wrong kind of a load in the gun. But it does not make any difference; if he did use that care, and intentionally and purposely pointed the gun at these parties, within shooting distance, and caused it to shoot and kill the deceased, it amounted to manslaughter.''

This is a clear statement of the law, as laid down by the authorities hereinbefore cited in this, and in the former, opinion. It should not be necessary to repeat them. The law of accidental homicide, as laid down in the case of *State* v. *Justus,* 11 Or. 178 (8 Pac. 337, 50 Am. Rep. 470), has long been followed in this jurisdiction.

The defendant refers to the valuable opinion of Mr. Justice McBRIDE in *State* v. *Clark,* 99 Or. 629

(196 Pac. 360), involving an instruction upon due care. The Clark case rests upon a wholly different set of facts. Clark and his companion were in a remote forest, hunting deer, at the time of the alleged firing of the fatal shot. In the case at bar the defendant was, according to his own statement, knowingly pointing his shotgun toward persons moving from him upon the highway, when he fired the shot that resulted in the tragedy involved herein.

13. The court based its final instruction upon the provisions of Section 1925, Or. L., as amended by Chapter 117, General Laws of Oregon, 1925, reading:

"It shall be unlawful for any person over the age of twelve years, with or without malice, purposely to point or aim any pistol, gun, revolver or other firearm, within range of said firearm, either loaded or empty, at or towards any other person, except in self-defense."

The term "self-defense," as used in that statute, is employed not in a narrow, but in a broad, sense.

The writers on criminal law include in the term "self-defense" the principal civil and natural relations.

"Therefore, master and servant, parent and child, husband and wife, killing in the necessary defense of each other, respectively, are excused. * * 1 Russ. Cr. 662; 1 Hale P. C. 484; 4 Bla. Com. 186; Foster, 274." Note, p. 750, Horrigan & Thompson, Self-Defense.

14. Under our Code, the killing of a human being is justifiable, when committed by a person "to prevent the commission of a felony upon the property of such person, or upon property in his possession, or upon or in any dwelling house where such person may be." Or. L., § 1909, subd. 2. And such killing is generally denominated by criminal law writers as a homicide

committed in self-defense. To point a gun at a midnight burglar to prevent his felonious purpose is an act of self-defense; but neither the deceased nor his companions were engaged in the commission of a crime when the defendant pointed his gun at and toward them.

15. What is the meaning of the word "toward," as employed in the statute denouncing the pointing of a gun toward another?

"Toward. In a course or line leading to. In the direction of." Funk and Wagnall's New Standard Dictionary of the English Language.

"The word 'towards' means in a course or line leading to or in the direction of." Pope's Legal Dictionary.

"Towards. In the direction of;—indicating:

"1. Direction in space; as, galloping toward town. He set his face toward the wilderness." Webster's New International Dictionary.

"Toward or towards. In the direction of." 38 Cyc. 591.

In the case of *Lange* v. *State,* 95 Ind. 114, the court, in defining the term "toward," as used in statutes similar to our own, said:

"The word 'toward' is one of very comprehensive signification, for it means 'in the direction of.' "

In that case, the defendant was on the outside, and the prosecuting witness on the inside, of the house, and the court held that pointing the gun at the house was pointing it towards the prosecuting witness.

The defendant Trent says that he intentionally pointed his gun in the general direction of the deceased. If this is true, under the circumstances as disclosed by the evidence he committed an offense that was *malum in se.*

16. What constitutes *malum in se?*

"An offense *malum in se* is properly defined as one which is naturally evil, as adjudged by the sense of a civilized community. An act which is *malum prohibitum* is wrong only because made so by statute." 8 R. C. L., p. 55.

17. It is universally held that the fact that the act which caused a homicide was not a misdemeanor at common law does not relieve the killing from constituting manslaughter if the act is made a misdemeanor by statute: *People* v. *Harris,* 214 Mich. 145 (182 N. W. 673, 16 A. L. R. 910).

Again: "The fact that an act which caused the death of a person was not a misdemeanor at common law does not prevent such homicide from being manslaughter where the act is made a misdemeanor by the statute." Wharton on Homicide, § 337.

To the same effect, see 8 R. C. L., p. 55.

2 Pope's Legal Definitions defines *malum in se* as an act that is intrinsically wrong.

As bearing upon this subject, note the following from 13 R. C. L., p. 848:

"An unintentional homicide is a criminal offense when occasioned by a person engaged at the time in an unlawful act. While this undoubtedly is a general principle, it is subject to the important qualification that if the act in question is not inherently dangerous and there is no negligence in its performance, there is no criminal liability unless the act was *malum in se* and not merely *malum prohibitum,* though some courts do not observe this distinction."

For the above, there is much authority.

In this connection, we quote the following from 1 Bishop on Criminal Law (9 ed.), Section 331:

"In these cases of an unintended evil result, the intent whence the act accidentally sprang must proba-

bly be, if specific, to do a thing which is *malum in se,* and not merely *malum prohibitum.* Thus Archbold says: 'When a man in the execution of some act by misfortune or chance, and not designedly, does another act for which if he had wilfully committed it he would be liable to be punished,—in that case, if the act he was doing were lawful, or merely *malum prohibitum,* he shall not be punishable for the act arising from misfortune or chance; but if *malum in se* it is otherwise.' "

See, also, *Commonwealth* v. *Adams,* 114 Mass. 323 (19 Am. Rep. 362); *State* v. *Horton,* 139 N. C. 588 (51 S. E. 945, 111 Am. St. Rep. 818, 4 Ann. Cas. 797, 1 L. R. A. (N. S.), 991).

In the recent case of *State* v. *Budge,* 126 Me. 223, 137 Atl. 244, the Supreme Court of Maine said:

"There is more or less seeming confusion in the cases, owing to some being brought under statutes expressly declaring homicides resulting while committing a misdemeanor to be manslaughter, thus abolishing any distinction between *malum in se* and *malum prohibitum.* A statute of this nature exists in very many of the states, but where no such statute, as in this state, we think the rule is that. where involuntary homicide happens while engaged in an unlawful act, if the unlawful act is *malum in se,* misadventure does not excuse, and the offense is manslaughter. Or if *malum prohibitum,* and the unlawful act is shown to be the proximate cause of the homicide, especially if the statute prohibiting was for the purpose of safeguarding human life or safety, misadventure will not excuse."

18. The several statutes similar to Chapter 117, Laws of 1925, were enacted chiefly for the purpose of making the foolhardy practice of pointing a gun at another an offense; and, under such statutes, where one purposely points a gun at another within shooting distance, and not in self-defense, without any in-

tention to take life or to do bodily harm, such gun being unintentionally discharged and killing the victim, the offense is regarded as manslaughter: *Henderson* v. *State,* 98 Ala. 35 (13 So. 146); *Barnes* v. *State,* 134 Ala. 36 (32 So. 670); *State* v. *Goodley,* 9 Houst. (Del.), 484 (33 Atl. 226); *Surber* v. *State,* 99 Ind. 71.

19, 20. It is claimed that the court erred in giving the following instruction:

"I charge you that stealing, or attempting to steal, melons of no greater value than $35 is not a felony, and that the defendant had no right to use force to prevent the stealing of melons of less value than $35."

21. That instruction, taken alone, is erroneous. But, when read with reference to the whole charge and the evidence of record, it does not constitute error. If charges to juries are to be condemned because of the fact that mere excerpts therefrom contain incomplete statements of the law, then, indeed, few charges would escape censure. The evidence discloses that but one kind of force was involved in this case, and that force concerned the fatal firing of a shotgun. However, that it is lawful to use such force as may seem necessary to prevent a trespass upon property, governed always by the standard of what a reasonably prudent man would do in like circumstances, is elementary: *People* v. *Payne,* 8 Cal. 341; Horrigan & Thompson, Self-Defense, p. 863.

22, 23. The defendant in this case has been fairly tried and has received the benefit of an able defense. Nevertheless, there is no valid reason for granting a rehearing. To reverse the case on the ground of error in the giving of abstract instructions on self-defense would be to overturn precedents long recognized by

this court. Likewise, a reversal on account of instructions on excusable homicide would make it necessary to expand the meaning of that term as defined by law.

The petition for rehearing is denied.

REHEARING DENIED.

BELT and ROSSMAN, JJ., did not participate in the consideration of this case.