Defendant was convicted of child stealing and appeals. Affirmed.
The defendant, James Metcalf, was indicted and tried for the crime of child stealing. The statute is as follows:
"Child Stealing, How Punished. Every person who maliciously, forcibly, or fraudulently takes or entices away any child or minor under the age of sixteen years, with intent to detain and conceal such child from its parent, guardian, or other person having the lawful charge of such child, shall, upon conviction thereof, be punished by imprisonment in the state penitentiary not less than one year nor more than twenty-five years, or by fine not exceeding $10,000." Section 1927, Or. L.
The indictment is as follows:
"The said James Metcalf, on the 6th day of August, 1928, in the county of Union and State of Oregon, then and there being, did then and there unlawfully, feloniously, maliciously, forcibly and fraudulently take and entice away one Nina Case, who was then and there a child and minor under the age of 16 years, with the intent on the part of him, the said James Metcalf, to then and there detain and conceal the said Nina Case from one Blanche Case, who was *Page 579 
then and there the parent of and the person having lawful charge of the said Nina Case."
A change of venue was requested, and the cause was transferred to Wallowa County for trial. At the commencement of the trial defendant's counsel, after the opening statement had been made, requested the court to require the prosecution to elect as to whether the taking of the child was maliciously, forcibly, or fraudulently. In considering this, the court said:
"The Court: I think that the state has already in the opening statement, informed the jury, that it will attempt to prove that it was forcible, by having a gun and threatening to kill. Is that the idea?
"Mr. Helm: It is, your honor.
"The Court: It is not my idea that they must take one of two or three qualifying words in the statute, but I think the question is pretty well settled by the opening statement of the district attorney. I will deny the motion to confine them to any particular one. I think the matter fairly well takes care of itself.
"Mr. Hess: We save an exception."
The testimony of the child indicated that defendant was on friendly terms with the Case family which seems to have then consisted of Mr. and Mrs. Case and Nina Case, the child, who at the time of the occurrence in question was six days under the age of thirteen years. There were three bedrooms in the Case dwelling, the one nearest the door being usually occupied by Mr. and Mrs. Case; the next by other visiting persons which sometimes included the defendant, and the last room in the corner by Nina Case. To enter Nina's bedroom by the front door, would require a person, so entering, to pass the room occupied by her parents; but Nina testified that there *Page 580 
was a window broken out in her room so that a person could enter through the opening caused by the missing window. For a week previous to the occurrence, Nina had been sleeping outside in an automobile a short distance from the house. A few days previous to the occurrence, defendant had borrowed a wagon and a bay bald-faced horse from Mr. Case. The horse had been injured in one foot by barbed wire so that, as a result, the hoof had grown in, partly covering the frog of the foot, thereby causing the track to appear smaller than the tracks of the other feet, and otherwise presenting a rather unusual and noticeable appearance. This fact will become material further as furnishing some corroboration of her account of the route she claims the defendant took on the night of her alleged abduction. The distance from where the Case family lived to the cabin of the defendant near which she was secreted, seems to be about twenty miles, perhaps a little more than that. No map of the locality or road is in evidence, and the testimony as to direction is meager, although not absolutely essential. Defendant's cabin is in a somewhat secluded spot in the mountains, and, except for a clearing where it is situated, the country appears to be timbered and brushy with scant settlements, if any, near to the clearing of defendant. The road to, and, perhaps, passing the cabin is rough and untraveled.
Having probably inadequately furnished a background for the testimony introduced, we now recur to that. Nina Case, the principal witness, after stating the fact that on August 6th she was sleeping in the automobile, as previously mentioned, her testimony on direct examination is as follows: *Page 581 
"Q. Do you know Bud Metcalf? A. Yes.
"Q. How long have you known him? A. About a year and a half I think, — something like that.
"Q. Did you see him on the 6th of August? A. Yes, the night of the 6th.
"Q. About what time of night on the 6th? A. About nine o'clock, I think.
"Q. Had you yet gone to bed? A. Yes.
"Q. Tell the jury now the circumstances under which you saw him and how you happened to see him at that time? A. Well, I was sleeping out in the car, and Bud came to the car there about nine o'clock, or a little after, and told me to get ready because I was going to the homestead with him, and I told him I didn't want to go, and he threatened me; he had a gun, and he said if I hollowed, he would kill me, and kill my folks when they came out. And so I got ready and he took me up, and when we got down by the corner of the fence, why he picked up my clothes. He already had them down there, and when we got up to the Harding field, he had our bay mare there, and he put me on her, and tied my clothes on, and then he got behind me, and we cut through the fields and went out by the Shumace place, I don't know what place it is, — a place up there about three miles from his homestead, and he got his white mare or work horse, and took her, led her behind us, and when we got down in the flat at his homestead, why he saw some horses and mules, and he said that Ben Chandler was there, and when we got to the house, he let me off right there, — there was some trees right by the side of his house, and he let me off there, and told me to stay there until he came back, and he went around to the house, and then he came back around to where I was at, and took me in the house, and got breakfast. Then he took me into the timber and hid me, and he moved me around a few times. I don't know, — I think it was Thursday in the morning, that he came back from going down to the folks, — where the folks was, and he told me he had been down to see the folks, and that he was going to move *Page 582 
me, and he moved me over to the place where Mr. Breshears found me, between two logs; and then Mr. Breshears came up there and he called `Nina' and I heard him, and I answered him and he came to me, and I went to him, — it was just a little ways, and then he came and got my clothes and things, and took me down to the house and Frank Hallgarth was there watching Bud, and they put us in the car, and brought us down to Elgin, and when we got down there the folks was, — * *
"Q. Now did you know Mr. Breshears before that time? A. Yes.
"Q. Did you know him well? A. Yes.
"Q. Did you ever stay at his house? A. Yes.
"Q. More than once, — several times? A. I stayed there several times.
"Q. Did you know his voice when he called to you? A. Yes.
"Q. Did you at that time know Mr. Breshears was sheriff? A. Yes.
"Q. Had you seen Mr. Breshears at any other time than that time when you were in the woods? A. No.
"Q. That was the only time that you saw him in the woods at all? A. Yes.
"Q. Now Nina, what did Bud tell you in order to keep you there in the woods? A. Well, he threatened if I left there, or if anyone tried to get me away, or I started to leave, he would kill me, and then kill whoever was there.
"Q. How did you get your food and water, while he had you there in the woods? * * A. He brought them to me.
"Q. Would he bring them to you every day? A. Yes.
"Q. Did you at any time stay in the cabin with him? A. No, only that first morning, when we first got there, and only long enough to get breakfast.
"Q. And did he furnish a bed for you in the woods? A. Yes. *Page 583 
"Q. Then are we to understand that all of the time that you were there you slept out in the woods? A. Yes.
"Q. Would Bud tell you when he was going to town? A. No.
"Q. He told you, — did he tell you about the time that he went down to see the folks? You said something about his having seen the folks? A. He told me the next morning, after he came back, he went down to see the folks.
"Q. Was there a man or anybody present at the time you had breakfast with him that first morning? A. Dan Chandler was there.
"Q. Now what did Bud tell you if anything was the reason that he was taking you there? A. When we first started he said Glenn Herron was up at the homestead.
"Q. That he was at the homestead? A. Yes. And after we got up to the homestead he said that Glenn had double-crossed us and left. * *
"Q. He told you that Glenn Herron was at the homestead? A. Yes, after we got, — he got me out of the car, and got started to the homestead.
"Q. He didn't tell you that when he told you that you had to go with him to the homestead? A. No.
"Q. After you got to the homestead and Herron wasn't there, what did he tell you? A. He said Glenn had double-crossed us, and wasn't there, and he had tried to get him to come, and then a few days after that why he said he didn't intend to take me to Glenn Herron at all; that Glenn wasn't even there; that he took up for himself.
"Q. That he did? A. That he took me for himself.
"Q. And he did use you for himself? A. Yes. * *
"Q. What did he do? A. What do you mean?
"Q. What did he do to you? A. He forced me to have intersection with him.
"Q. Did you ever at any time ask him to take you away from your home? A. No.
"Q. Did you at any time agree with him to go? A. No. *Page 584 
"Q. To Glenn Herron? A. No.
"Q. Or any other man? A. No."
She was vigorously cross-examined and some discrepancies were shown in her testimony. She admitted seeing her father and another man, whom she did not recognize, and also her brother at the cabin, but adhered to her statement that she was afraid to disclose herself for fear that defendant would do them and herself injury.
Jesse Breshears, the sheriff of Union County, was called as a witness for the state, and testified that on the second day of September, being about 26 days after Nina disappeared, he went to defendant's cabin and finding the defendant outside placed him under arrest. The defendant inquired the reason, and the sheriff said: "For the simple reason that you are suspicioned of stealing the Case girl, or having a hand in it," and he says, "I don't see why you or anybody else would think I had a hand in that, I don't know anything in the world about it."
Leaving defendant in charge of the deputy, the sheriff followed some tracks leading into the woods and finally called the girl's name, "Nina" and she answered, and came to him. She was well acquainted with him, having been frequently at his home playing with his little girl. He testified that she came at his call, "ran and grabbed right on to (him) and cried and took on, and was scared awful bad." Here the sheriff was interrupted by an objection. After hiding Nina behind a tree, the sheriff testified, "I went up to Bud and I never said a word, but just walked up and looked right at him, and he says, `Did you find her?' I says, `I sure did, and you are the most low down man I ever knew of. * *' Bud says, `I didn't bring her up, another fellow did.' *Page 585 
First, he told me he didn't know anything about it, not a thing in the world, and then he admitted that she was up there for another fellow, but that he didn't bring her up there."
Luther Hindman testified, that on the evening of August 6th he saw defendant riding on the bald-faced horse, described by other witnesses, going on the road leading to the Case residence, but about twelve miles therefrom, and about nine or ten miles from defendant's cabin.
Mr. Case, father of Nina, testified to loaning the bald-faced bay horse to defendant about the first of August, and about the peculiarities of its hoof. Mrs. Case testified that defendant was at their home on Wednesday before the Sunday that Nina was found and stayed all night and took breakfast there, and that she asked him if he knew anything about Nina and he said "he didn't know anything about it." Both Mr. and Mrs. Case testified that the taking of Nina was not with their consent or knowledge.
Dan Chandler, a sheep herder, testified that he was camped on defendant's place, and that on the morning of August 7th he went to the cabin about 6 o'clock in the morning and saw Nina with whom he was not acquainted; that she was sitting near the stove reading a magazine; that he stayed and breakfasted with defendant and Nina; that he did not know her name and was not introduced to her, or had any conversation with her; that Metcalf never said anything about her being the Case girl and that he must keep still about her as related by Nina; and that when they went outside he asked defendant who she was, and he answered, "that is a lady friend of mine." The witness was somewhat hard of hearing. *Page 586 
Bert Rysdam, who lives about two and one-half miles from the Case residence, and who was familiar with the peculiarities of the hoof of the horse loaned by Case to the defendant, testified that on the morning of August 7th, he saw the tracks of that horse in the road and followed them to where they left the road to where they turned off through a gate into the Fine place, which was about halfway between his place and the Case place.
Almost every witness was subjected to a long and skillful cross-examination by defendant's counsel, but space forbids more extended quotations.
On the part of the defense, there were several witnesses introduced to show the previous good reputation of defendant, and, as to this condition, there was no contradiction.
The defendant testified in his own behalf. His examination is too long to be given verbatim, but, after testifying as to the fact of his residence on Clark's Creek, the principal points and his testimony are as follows:
"Q. Now you have heard the testimony in this case here? A. Yes.
"Q. I will ask you to state whether or not you at any time took a gun, and threatened the Case girl with a gun? A. I did not.
"Q. I wish you would explain to the jury how she happened to come up there to your place, and all about that? A. All right, I will try it. Well, she came up there looking for another man, and the paper admitted she did, — she told Jess Breshears she came up there looking for another man. * *
"Q. Just what she told you? A. She wanted me to take her to this other fellow.
"Q. Talk to the jury. A. And I asked her if she didn't want to go back home, and she said no, she came there to my cabin and set down on the bed, and asked *Page 587 
me to help her, and let her stay there at my house, and I told her people would be on the road, and told her she would get me into trouble about it, and they would be looking for her, and she said no, she wouldn't, — she wouldn't stay at the house, — which she didn't. She was there one morning, and then she was there a couple of evenings she was there at the house.
"Q. Did you at any time threaten her with a gun? A. No sir, I did not.
"Q. Did you at any time there threaten her that you would kill her and her people? A. No I did not, nor nobody else.
"Q. Now did you take her up there by fraud? A. No, I did not.
"Q. Now what if anything did she say as to why she didn't want to stay at home? A. She said that she could not get along with her folks; she said they kept nagging at her all of the time, and she didn't want to stay there.
"Q. She said she didn't want to stay there with her folks? A. And she also told me that she was going to leave with a fellow last spring, and it was on account of the weather she didn't go away last spring.
"Q. Who was it she wanted to see there? A. She came up there to meet Vaughn Mayfield.
"Q. Now was Vaughn Mayfield up there to your place while she was there? A. He was.
"Q. Now when was that, Mr. Metcalf? A. He was at my place Saturday evening before they found her on Sunday.
"Q. He was there at your place Saturday night? A. Yes.
"Q. How did he come there? A. He came horseback riding a little bay mare.
"Q. What sort of a looking fellow is Mayfield? A. Well, rather a slim like fellow.
"Q. About how old? A. Oh, I should think he is about twenty-three or twenty-two; I don't know just for sure, somewhere there. * *" *Page 588 
The defendant further testified that while Mayfield was there they met Joe Beddes and talked with him. Thereafter, the defendant continued as follows:
"Q. Now when Vaughn was up there where did you and he go? A. Went to where Nina Case was.
"Q. Went over to the Case girl did you? A. Yes, we did.
"Q. What did she, what was said there when she came out? A. Why she said `Hello,' and he said, `Hello' to her, and he says, `How are you,' and she says, `I am all right,' and she told him she was in trouble, and wanted him to help her, and he said, `all right, he would talk it over with her,' and I left them there, and went back down to the house, and they stayed up there that night together, and the next morning, and the next morning he came down to my house and ate breakfast with me.
"Q. This was what night? A. This was Saturday night.
"Q. State whether or not this was the Saturday night before the sheriff came up there? A. Yes, the next morning was Sunday, and I helped him catch his horse, and he left, along about, — I don't know, somewheres around three, or maybe a little after, — I don't know, the sheriff.
"Q. He left Sunday afternoon? A. No, he left in the morning. About three, or something like that, — that the sheriff came.
"Q. And he left Sunday morning? A. Between ten and eleven, — somewheres around there.
"Q. The sheriff came at what time? A. Somewheres around three; I don't know just exactly what time it was.
"Q. What if anything did she say to you as how her folks treated her? A. Why she said they just kept nagging her all of the time; she never said they whipped her or anything like that, but she said she was getting tired of being hounded around all of the time. *Page 589 
"Q. What if anything did she say about Vaughn Mayfield? A. Why she said she wanted to get to him, and she told me they were going to leave last spring together, and it was on account of the weather they didn't, and he also told me and I think he told another man or two about it.
"Q. Now when Vaughn came up there, when Vaughn came up there, he arrived at your cabin about what time? A. Oh, I think somewheres around three o'clock.
"Q. Three o'clock on what day? A. On Saturday.
"Q. Three o'clock on Saturday? A. Yes, before they got her on Sunday.
"Q. State whether or not she intimated to you, or made any statement down there to him in your presence, as to who got her into trouble there? A. She claimed that he did.
"Q. What did he say? A. Well, he said if it was his, all right, if he got her into trouble, he would sure see her through it.
"Q. Did you have intercourse with the girl? A. No, I did not.
"Q. Did you ever at any time sleep with her? A. No, sir, I did not.
"Q. Did you ever force her, or urge her in any manner to go with you? A. No, I didn't.
"Q. Did you ever in any manner force her to stay up there? A. No sir, I didn't. I was hauling wood most of the time during August, and I was gone all day, lots of days wouldn't be back until after dark, — lots and lots of days.
"Q. Now you heard her statement she was lying on the bed when Mr. Chandler came in there that morning? A. I did.
"Q. How about that? A. She was sitting by the stove with her feet in the oven reading a True Story Magazine.
"Q. Did she make any request of you that you get her anything in town? A. Yes. *Page 590 
"Q. What did she want? A. She wanted me to bring her cigarettes at one time, wanted me to get her some Chesterfields, and I told her I would.
"Q. Mr. Metcalf, did you ever at any time hold this girl, or attempt to keep her from getting back to her own people? A. I did not.
"Q. Tell the jury what you told her? A. I told her she ought to go back home, — is what she ought to do, because I didn't think Mayfield would stay with her if she got to him.
"Q. What did she say to that? A. She said, yes he would, she didn't want to go back home. And then she told me finally, she said, if I wouldn't take her to Mayfield, to get her to her brother some way down to Condon. I told her I wouldn't tell her brother nothing about it; it was a sure cinch he would get me in bad if I did.
"Q. What clothes, — how many clothes did she have there with her? A. Why she had quite a sack full of clothes; I don't know what all it was, had a sack full of clothes.
"Q. Now then why didn't you let her stay there in your cabin? A. Well, sir, I really didn't want her around there as there was people at my cabin all of the time, people came up through there right along. There is lots of people up there at different times and stay nights with me along at that time, and they were working on the road; and Harry Ruhl and his family was up there a couple of different times. * *
"Q. And so that the girl, where she was, was that between your house and the road? A. No, she was just off my land just a little ways. This road that Hugh Little was cutting through there, part of it was right along my fence line, and she was probably a hundred yards from that road, something like that, somewheres around there.
"Q. Did she ever at any time cry, or beg you to take her back? A. Not as I heard, she did not.
"Q. How many times did you urge her to go back to her folks? A. Well, we had quite an argument *Page 591 
about that one night, — one evening when I taken her supper up to her, and she always swore she didn't want to go back, and said she wouldn't go back.
"Q. Do you know whether or not, — did you know that Mayfield was coming up there on the day he came up there? A. I didn't know for sure he was coming that day, no.
"Q. You say you didn't know for sure he was coming that day. Did you figure from anything she said otherwise? A. Yes, I knew he would be there after a while."
The witness further testified as to seeing Mayfield and Nina together very frequently in the spring of that same year. Concerning his alleged statement to the sheriff, the witness testified as follows:
"Q. Why did you tell the sheriff that the girl wasn't there? A. Why did I tell him?
"Q. Yes. A. I didn't tell him that.
"Q. What did you tell him? A. Well, sir, he came up there, — they drove up and asked me if they could get up that hill out the other road, and I told him no, that if they figured on going up that hill I would catch a team and pull them up there, and he got out of the car, and came around down by the door, — I was setting on the porch starting to roll a cigarette, and he looked in at the door, and then he walked up opposite the post and he asked if I knew who he was, and I told him, yes, I knew who he was. Well, he says, `I came up here to look for that girl of Cases; there is a pretty strong suspicion she is up here.' I says, `Just go ahead and help yourself.' And he put a pair of handcuffs on me, and left Frank Hallgarth there at the car, and I was sitting on the porch, and he came up and went in the house, and took the cartridges out of the Winchester. And I told Frank, — I says, `Hand me my tobacco on the table,' and Frank Hallgarth handed me my tobacco, and I rolled a cigarette. He says, `Whose is that track coming up the road,' and I told him, — I says, *Page 592 
`Made by a man you both know,' and he went down the road and followed Mayfield's tracks to where the girl was, where Mayfield came from there that morning. * *
"Q. Did you ever at any time tell her that a fellow by the name of Herron was up there? A. No, sir, I didn't.
"Q. How is that? A. No, I didn't.
"Q. Did you ever tell her you would take her to British Columbia? A. No, sir, I didn't tell her I would take her to British Columbia.
"Q. Did you tell Chandler that this was the Case girl, and not to say anything about it, or anything about that? A. I don't recall whether I did or not, I don't recall that I did, I don't think I did. * *
The witness testified extensively as to the supposed relations between Mayfield and Nina, intimating that she was hiding out on his place to get in contact with Mayfield.
Joe Beddes testified that on the last Saturday in August he was at the Metcalf place he met Metcalf and a slim fellow of light complexion that he didn't know, probably twenty or older. It may be said that his description of the appearance of this party in some particulars tallied closely with the description Metcalf gave of Mayfield. The defendant denied that he rode the bay pony through the Rysdam field. He admitted that he moved Nina's location once, but that it was at her request.
In rebuttal, Mr. Case, Mrs. Case and Mrs. Blanche Graham, a sister of Mayfield, who was visiting at the Case home, testified that Mayfield was at the Case home on Saturday, September 1st; that he worked there all day Saturday, slept there Saturday night and was there on Sunday.
AFFIRMED. *Page 593 
The indictment charged but one crime, namely, child stealing. The fact that it might have been committed by different methods, and that the prosecution could succeed by proving any one of them, was settled much to the writer's discomforture inState v. Carr, 6 Or. 133. This decision made fifty-three years ago has stood the test of the court from the day it was rendered until the present: State v. Bergman, 6 Or. 341;State v. Dale, 8 Or. 229, State v. McCormick, 8 Or. 236;State v. Humphreys, 43 Or. 44 (70 P. 824); State v.White, 48 Or. 416 (87 P. 137), and other cases.
We find no precedent in this state, in cases of the character of those above cited, requiring the state to elect the particular method by which the crime may have been committed, and rely upon that to the exclusion of other methods enumerated in the statute, and in the indictment. The court refused to do so in this case. There was no election, and there was no such contradiction in the means enumerated as would put the defendant off his guard, or have prejudiced him in his defense. The testimony shows that the defense was directed against force, fraud or enticement.
From this we are naturally left to a discussion of questions raised by defendant upon instructions refused by court and other instructions given over his counsel's objection. The able counsel for defendant *Page 594 
seem to confuse the statute against child stealing with that against kidnaping and, while, originally, prosecutions for unlawful taking of children were dealt with in pursuance of the law punishing kidnaping, it has been found that such statutes, so far as they followed the common law, were not always adequate. The kidnaping statutes, which were applicable alike to adults and children, more generally viewed the offense as one against the person unlawfully taken, while the statute against child stealing has in view principally the right of the parent to the custody, dominion and care of the child, so that stealing the child from its parents is primarily an offense against the parents. This was so held to an extent even in prosecutions under the kidnaping statute, the child being deemed incapable of consent, even though willing to be taken. Thus, in State v. Farrar, 41 N.H. 53,59, it is said:
"Laws of this character seem to have originated in the especial purpose of furnishing protection to children. And we are disposed to hold that the child was incapable of consent to the seizure and removal, and that, being taken from its lawful custody, it must be deemed to have been taken without its consent as matter of law. It was so held in the case of a child ten years of age inState v. Rollins, 8 N.H. 565. In the case of children of that age, when they are in the place of their lawful custody they are deemed to be free, but when taken away against the will of their rightful guardians, they are justly regarded as under illegal restraint. So it is held in proceedings on habeas corpus, and such is the law, we think, that governs this case."
So here Nina being a child thirteen years of age and under the dominion and control of her parents, could not consent to her abduction, and, whether she went *Page 595 
voluntarily or otherwise with defendant, her taking was a trespass against the rights of her parents and forcible as to them. So it matters not whether she wished the defendant to take her or not, it was in the eyes of the law a forcible taking. The same may be said as to the charge of fraudulent taking. The fraud was not committed against the child, but against the parent. It was a fraud upon their paternal rights to take the child from their custody, and, especially, where the taker concealed her from their search, lied to them concerning her whereabouts and did everything to frustrate their efforts to find her.
Stealing of a child is in some respects like larceny of an animal; it is a continuing offense, and, if Nina had gone to the defendant's cabin alone unattended, and being there he attended her to a place of concealment, helped to conceal her and thereby kept her from the possession and control of her parents, he would be guilty of child stealing within the meaning and intent of this statute. If he added any argument or inducement to her going or staying after she had gone with him or to him, he was guilty of child stealing.
The foregoing considerations dispose of the objection of defendant to the following instruction:
"Forcibly, as used in this statute, is established if the state proved to you, beyond a reasonable doubt, that the taking and enticing be against the will or without the consent of the parent, and whether a child did or did not consent is not material in such a case as charged in this indictment."
This also answers appellant's objection to instructions given on the same subject. *Page 596 
Exception is taken to the refusal of the court to give the following requested instruction:
"I instruct you, Gentlemen of the Jury, that there is no evidence in this case that the defendant took or enticed away Nina Case maliciously. That element of the charge in the indictment is not established. Give it no consideration."
Defendant's counsel also excepted to the following instruction given by the Court on the same subject.
"In this case the defendant is charged with the crime of child stealing. Under the law of Oregon, before the defendant can be found guilty, the state must establish to your satisfaction, beyond a reasonable doubt, the elements of that crime. The elements of this charge which must be established by the state are that the defendant either maliciously, forcibly or fraudulently took or enticed away Nina Case with intent to detain and conceal said Nina Case from Blanche Case. Where a child is enticed away from the control of its parent, against the will of such parent, the enticement is fraudulent, although no actual fraud is practiced in securing the child's consent to the taking. The word `entice' means to draw on by exciting hope, and desire, to allure, to attract. The terms `malice' and `maliciously' when so employed import a wish to vex, annoy, or injure another person."
If taking a child from its parents and concealing it under the most sordid conditions would not have a tendency to vex, injure or annoy its parents, we know of nothing which would have that effect. Such an act is clearly within our Code definition of malice, which is:
"The terms `malice' and `maliciously' when so employed, import a wish to vex, annoy or injure another person, established either by proof or presumption of law." Section 2396, Or. L. *Page 597 
It is also presumed that a person intends the ordinary consequences of his voluntary act: Or. L., § 799, subd. 3. The instruction was clearly correct.
We have attempted to review technically the proceedings incident to the trial, and do not find in them any error which, in our view, prevented defendant from having a fair trial. Seldom is a long drawn out trial like the present one conducted without some technical error creeping in. But even if such error had been committed, we feel assured from the evidence that the defendant took this child from the home of her parents for the vilest of purposes, kept her in concealment, lied as to his knowledge of her whereabouts, used her person for his own pleasure, and that he is clearly guilty as charged and, by subdivision 3c of Section 1 of Article VII of the Constitution, we would be fully authorized to affirm the judgment even in the face of technical error, but we are under no such necessity.
The defendant was assisted by very able counsel, who left no stone unturned to secure his acquittal. At his request, his case was transferred to another county for trial where local prejudice would cut no figure against him, and, while the penalty inflicted is severe, it is but justly adequate to his disgusting offense.
The judgment is affirmed.
AFFIRMED.
BEAN, ROSSMAN and RAND, JJ., concur. *Page 598