· Argued May 21, reversed and remanded July 8, 1953

# STATE OF OREGON *v.* NODINE

259 P. 2d 1056

*David C. Shaw,* of Gold Beach, argued the cause for appellant. With him on the brief were Buffington, Shaw and Starkweather and William E. Taylor, of Gold Beach.

*Herbert R. Dewart,* District Attorney, of Gold Beach, argued the cause and submitted a brief for respondent.

Before LATOURETTE, Chief Justice, and WARNER, ROSSMAN, LUSK, TOOZE and PERRY, Justices.

LUSK, J.

The defendant, James Kay Nodine, Sr., has appealed from a conviction of murder in the first degree with recommendation of life imprisonment by the jury. The indictment charged the defendant with the killing of Marius Sorenson by shooting him with a 30-30 rifle.

That the defendant shot and killed Sorenson with a 30-30 rifle is admitted. His defense is that the homicide was justified and that it was the result of a misadventure.

The tragedy occurred on the Sixes River Road in Curry County, Oregon, on June 18, 1952. The defendant, a man 65 years of age, lived on a ranch in the settlement known as Sixes River at the junction of the Sixes River Road and Highway No. 101, about six miles north of the town of Port Orford. On June 18 he started out in his automobile in search of a man named Clifford Shields, who at the time lived with his family at a place called Plum Trees on the Sixes River Road about nine miles east of Highway No. 101, commonly known as the Coast Highway. Shields operated a sawmill about four miles above Plum Trees. The defendant's purpose in seeking out Shields was to recover the custody of his fourteen-year-old daughter, Wanda, who, for some time before this, had been living at the Shields' home. He believed that Shields had concealed from him the whereabouts of Wanda. He had in his automobile a 30-30 rifle, which previously he had threatened to use against Shields if his daughter was not returned to him. He drove up the Sixes River Road to Shields' mill, and learned there on inquiry that Shields had gone to town to get a part for his power saw. He turned back, stopping on the way at Shields' house, but found no one there, and he continued down the road until he met an automobile com-

ing towards him which was driven by Sorenson, an employee of Shields, and in which Shields was riding as a passenger on the front seat. The defendant signaled the Sorenson car to stop and brought his own car to a stop. Sorenson pulled over to the side of the road and likewise stopped. The defendant got out of his car and shot and killed Sorenson. The defendant and Shields were the only eye witnesses to the killing and their versions of the circumstances are in sharp dispute. According to Shields the defendant, before stopping, drove past the Sorenson car about 150 feet and then backed up until the two cars were about opposite each other. The shooting occurred on the left or driver's side of the Sorenson car.

Shields testified:

"Q  Where was his car when he backed it up, at the time he stopped it, with respect to the car you were riding in?

"A  Beside it.

"Q  How far away, would you say?

"A  Eight or ten feet.

"Q  What did he do when he stopped?

"A  He jumped out of the car and he said you son of a bitch and then he shot.

"Q  He brought a rifle with him when he got out?

"A  He did."

The left-hand window of the Sorenson car was open. The bullet passed through the door and the lowered window and entered Sorenson's body at the seventh rib on the left side, leaving the body on the right side at the eleventh rib. The bullet went through the left lung and struck the left ventricle of the heart, crossed through the diaphragm and into the dome of the liver, and thence through the eleventh rib. Sorenson died within a few minutes after he was shot.

The defendant testified as follows:

"Q You weren't sure who was in the car until it stopped?

"A No, and I half way recognized him [referring to Sorenson] and I said where is Shields, and he said he is here. Shields popped up and said what do you want. I said I want my girl, I said where is she. He said I haven't seen her for two weeks. I said quit your lying, she was there two or three days ago, what have you done with her, you tell me and I will go get her. He said I haven't seen her for two weeks. I got hot under the collar, and sweating, and I said now wait a minute, and I walked back to the car about twenty feet down the road and got my rifle and walked back and I said now tell me where my girl is. He said I don't know, I haven't seen her for two weeks. I said quit your lying, tell me the truth. I then raised the gun and I said you tell me where the girl is or you will lose about that much. He said, no, no, Kay, don't, and about that moment the boy sitting the car [sic] comes up like this and grabs the gun and tries to jerk it away from me, and I jerks back, and somehow it went off and went through the door, and that is it."

The defendant swore that he had no intention of killing anyone. He testified:

"Q When you met the car in which Sorenson and Shields were riding, did you have any intention of killing anybody?

"A No, I did not.

"Q What was your intention?

"A I was going to get my girl, and solely that."

The foregoing statement of the evidence will suffice for a consideration of assignments of error numbered 3 and 4.

## I. INVOLUNTARY MANSLAUGHTER.

The court instructed on first and second degree murder and voluntary manslaughter, as defined in § 23-405, OCLA, but did not instruct on involuntary manslaughter, which is denounced by § 23-406. No request for such an instruction was made, but the following exception was taken by counsel for defendant:

"MR. SHAW: The court has in its instructions stated only one definition of manslaughter, that being voluntary manslaughter, and there was no definition of involuntary manslaughter, and we except to that."

The court then said:

"There was none requested. You may have that exception."

The ruling is assigned as error.

▉▉ Whether, in a capital case, the mere taking of an exception to the court's failure to instruct upon a crime of lesser grade included within the crime charged and of which under the evidence the defendant might be found guilty, raises a question for consideration on appeal, or whether there must have been a request for such an instruction, has not, we believe, been definitely determined by this court. In *State v. Magers,* 35 Or 520, 537, 57 P 197, the court assumed, but it did not decide, that an exception to an omission to charge on the law of manslaughter, where the indictment was for first degree murder, was equivalent to a specific request thus to charge. In the early case of *State v. Cody,* 18 Or 506, 23 P 891, 24 P 895, which was a prosecution for mayhem, it was held by a majority decision that it was the duty of the court to instruct fully upon the law applicable to the case, and a judg-

ment of conviction was reversed because of the failure to instruct on the included crime of assault and battery, even though there was no request for such an instruction and no exception taken to its omission. But this holding was overruled in *State v. Foot You,* 24 Or 61, 70, 32 P 1031, 33 P 537, in an opinion by Mr. Justice ROBERT S. BEAN, and it has ever since been the law of this state, applicable alike to criminal and civil cases, that "it is not error simply, but error legally excepted to that constitutes ground for reversal." *Kearney v. Snodgrass,* 12 Or 311, 316, 7 P 309. Among the many decisions applying the rule are *State v. Daley,* 54 Or 514, 523, 103 P 502, 104 P 1, and *State v. Kelley,* 118 Or 397, 247 P 146, both capital cases, in which the court refused to consider alleged errors in instructions in the absence of appropriate requests or exceptions. See, also, *State v. Duffy,* 135 Or 290, 308, 295 P 953, a prosecution for violation of the prohibition law, in which we said:

" * * * Ordinarily it is not error for the court to omit an instruction upon the lesser crime included within the greater where the defendant has failed to request an instruction upon the same."

The court cited *State v. Reyner,* 50 Or 224, 231, 232, 91 P 301, a larceny case, in which it was held on the authority of *State v. Foot You,* supra, that no duty rests upon the court to instruct upon the lesser crime unless requested to do so. In *State v. Wilson,* 182 Or 681, 189 P2d 403, we stated the rule in accordance with these authorities, but added that the weight of authority appeared to be that the court is required to give such instructions although not specifically requested, citing 26 Am Jur 543, Homicide, § 554.

The amendment of the statute governing exceptions by ch 257, Oregon Laws 1941, as construed by

us in *Williams v. Ragan,* 174 Or 328, 337, 143 P2d 209, has not in any way affected the substance of the rule. See, also, *Hotelling v. Walther,* 174 Or 381, 389, 148 P2d 933.

■ The question remains, however, whether its demands are satisfied where, although there is no request for an instruction, an exception is taken to the failure to give one. As a general rule we think it is not. An instruction on a lesser and included offense is not given as a matter of course in every criminal case, but its propriety depends upon the state of the evidence, and it is not infrequently a matter of difficulty to determine whether the evidence is such as to justify the instruction. Considerations of orderly procedure and of fairness to the state and the trial judge suggest that the matter be brought to the attention of the judge and of opposing counsel before the commencement of the charge. It is particularly important that the request for a ruling should not be deferred until after the jury has retired, as occurred in this case. The undue emphasis that may be attached by the jury to an isolated instruction given after they have retired for their deliberations, and, upon being called back into the courtroom for that purpose alone, must be obvious to all.

■ Nevertheless, in a case where human life is at stake, we are not prepared to apply a procedural requirement of this kind, salutary though it may be, in all its strictness. By Rule 2 of the Rules of the Supreme Court we reserve the "right to take notice of an error of law apparent on the face of the record." This is a proper case, we think, in which to invoke that power. We proceed, therefore, to a consideration of the question presented by Assignment of Error No. 3, based

upon the court's failure to submit to the jury the issue of involuntary manslaughter.

■ It is the rule in this jurisdiction, as elsewhere, that the court, when requested by defendant, must in its instructions cover every degree of homicide included in the indictment where the evidence and circumstances are such that different inferences or conclusions may properly be drawn therefrom as to the degree of the crime. And where the evidence is sufficient to raise a doubt, however slight, as to whether the homicide is one of two or more degrees the court must charge on all such degrees. *State v. Wilson,* supra, 182 Or 684, and cases there cited. See, also, 2 Michie, Homicide, 1708, § 308; Wharton on Homicide (3d ed) 263, § 165. If, therefore, in the instant case the state of the evidence was such as to warrant a verdict of involuntary manslaughter an instruction upon that subject should have been given. Section 23-406, OCLA, provides:

"If any person shall, in the commission of an unlawful act, or a lawful act without due caution or circumspection, involuntarily kill another, such person shall be deemed guilty of manslaughter."

■ At common law the crime was involuntary manslaughter where one doing an unlawful act not felonious or tending to great bodily harm, or doing a lawful act without proper precaution or requisite skill, undesignedly kills another. Wharton on Homicide (3d ed) 7, § 6; 40 CJS 918, Homicide, § 55. The elements of the unlawful act, "not felonious or tending to great bodily harm", are not expressly stated in our statute, but the statute has been considered by this court as intended to denounce the crime of involuntary manslaughter as defined at common law. See *State v.*

*Henderson,* 182 Or 147, 194, 184 P2d 392; *State v. Boag,* 154 Or 354, 364, 59 P2d 396; *State v. Trent,* 122 Or 444, 454, 460, 252 P 975, 259 P 893; *State v. Setsor,* 61 Or 90, 95, 119 P 346.

Section 25-104, OCLA, provides in part:

"It shall be unlawful for any person over the age of twelve years, with or without malice, purposely to point or aim any pistol, gun, revolver or other firearm, within range of said firearm, either loaded or empty, at or toward any other person, except in self-defense; and any person so offending shall be guilty of a misdemeanor * * *."

In Wharton, op. cit., 342, § 217, it is said:

"At common law one who draws a firearm upon another unnecessarily is guilty of involuntary manslaughter where it goes off accidentally and kills the other, though he had no intention of discharging it. And where a statute makes it a misdemeanor for any person to present at another any firearm, whether loaded or unloaded, and one intentionally points a firearm at another, though without any intention to take his life, and by accident it is discharged producing death, he is guilty of manslaughter in the performance of an unlawful act."

Many cases cited in the notes support the text, as does our decision in *State v. Trent,* supra. The defendant there was indicted for first degree murder and found guilty of involuntary manslaughter. The victim of the homicide was riding in an automobile with three other men at the time he received his death wound from a single-barreled shotgun discharged by the defendant. The killing occurred at night, and the defendant testified in substance that he believed the four men had been trespassing in his watermelon patch; that he thought the gun was loaded with rice or wheat; that he intended only to scare the men in the car, and

shot in the direction of the car and had no intention to shoot at or towards any person. It was contended on appeal that the indictment did not include the charge of involuntary manslaughter and did not inform the defendant of the nature of the charge. The court rejected these contentions, and held that, since the evidence showed a violation of the statute which makes it a misdemeanor to aim a firearm at another, and, in view of the evidence that the killing was unintentional, the judgment should be sustained.

■ We think it clear in this case that under the authorities the issue of involuntary manslaughter should have been submitted to the jury. The defendant testified on cross-examination that he held the gun aimed at Shields' head. There is no evidence, as we shall later undertake to show, that he acted in self-defense. He testified that he had no intention of killing anyone and that the gun was accidentally discharged in the struggle over it when Sorenson seized it by the muzzle. If these were the facts the jury would have been justified in returning a verdict of involuntary manslaughter. The court's refusal to instruct upon the subject deprived the defendant of a substantial right and constituted reversible error.

In view of a new trial, other questions arising on the record must be examined.

## II. PRESUMPTION OF MURDER FROM DELIBERATE USE OF DEADLY WEAPON.

The fourth assignment of error questions the correctness of the following instruction given by the court:

"The law also provides that an intention to murder is presumed from the deliberate use of a deadly weapon causing death within one year. Whether

or not the defendant killed Marius Sorenson, as I have said, is a question of fact for you to determine. Then if you find that the defendant killed Marius Sorenson, then it would· be another question of fact for you to determine the means or instrument, if any, used in the alleged killing and whether it was a deadly weapon, in deciding this issue. A deadly weapon is defined as one which in the manner used is likely to cause death or serious bodily injury.

"But this intent to murder arising from the deliberate use of a deadly weapon causing death within one year, if you so find, although conclusive and binding upon the jury, will not, in and of itself alone, raise the crime above the grade of murder in the second degree."

Defendant excepted to the portion of the instruction which told the jury in substance that an intention to murder is conclusively presumed from the deliberate use of a deadly weapon causing death within one year. It is true that the statute, § 2-406, Subd. (1), OCLA, declares the presumption to be conclusive. Nevertheless we have held that it is not a proper instruction to be given in every homicide case, at least without explanation or modification. The subject was discussed at length in *State v. Gibson,* 43 Or 184, 73 P 333, in an opinion by Mr. Justice WOLVERTON. This was a prosecution for first degree murder in which the killing was admitted and self-defense interposed as justification. A judgment of conviction was reversed because of an instruction similar to the one here challenged. The rule embodied in the presumption was criticized as "a logical non-sequitur", and was said to be "not now regarded as sound". But, inasmuch as the legislature had made the presumption conclusive and therefore indisputable, the court said

that "it should be given that effect where applicable, unless contrary to natural justice." The court concluded, after an examination of the authorities, that the presumption of an intent to murder incident to the deliberate use of a deadly weapon is "not always conclusive of the fact, and is only so when nothing else appears in evidence either to justify or excuse the act." The court said:

" * * * It was only intended to apply where the mere fact of killing with a deadly weapon deliberately used is shown, without else to modify or otherwise explain the act. Wherever, therefore, there is evidence of a tendency to rebut the presumption, whether it comes from the prosecution or the defense, it becomes a matter for the jury to consider whether it has been overcome, or is of weightier significance, so as to turn the scales of justice; and they must determine from all the evidence in the case whether the state has established the guilt of the accused beyond a reasonable doubt."

And, further:

" * * * The jury, therefore, should not be instructed that an intent to murder is conclusively presumed from the act of killing by the deliberate use of a deadly weapon, unless nothing else appears in the case—no other testimony—to modify or excuse the act."

The rule of this decision was restated in *State v. Davis*, 70 Or 93, 99, 140 P 448. In *State v. Gray*, 46 Or 24, 79 P 53, it appeared that the defendant had been acquitted on a former trial of first and second degree murder and was tried a second time on a charge of manslaughter. The court instructed the jury on the conclusive presumption in question. The defendant excepted to the instruction on the ground that it.

shifted the burden of proof. This court said that the instruction "was merely stating to the jury a presumption of law declared by the statute as interpreted by this court in previous decisions, and did not, as we conceive it, in any manner shift the burden of proof". The court then cited *State v. Carver,* 22 Or 602, 30 P 315, and *State v. Gibson,* supra. It was further said that the instruction "had no proper place in a trial for manslaughter, but was not prejudicial to the defendant, nor did it affect any substantial right of his." *State v. Carver,* supra, while not passing directly on the question, by inference at least, seems to approve the giving of the instruction in a case in which there was evidence of self-defense. In *State v. Jancigaj,* 54 Or 361, 103 P 54, the court instructed: "The law conclusively presumes malice from the deliberate and unlawful use of a deadly weapon causing death within a year". The court approved the doctrine of *State v. Gibson,* supra, and distinguished the case because the word "malice" instead of "an attempt to murder" was used in the instruction, and because of further instructions which modified the one complained of, and further held that, since the testimony had not been brought to this court, if the instruction contained a correct statement of the law and was applicable to some state of the case possible under the pleadings, error could not be based thereon. In *State v. Walters,* 105 Or 662, 209 P 349, the trial judge, after instructing the jury as to the statutory presumption, continued as follows:

"The deliberate use of a deadly weapon necessary to constitute a conclusive presumption of intent to murder is the use of such weapon without cause or provocation, real or imaginary; but this intent to murder arising from the deliberate use

of a deadly weapon, although conclusive and binding upon the jury, will not raise the crime above the grade of murder in the second degree. This means that if the state proves to you beyond a reasonable doubt that the defendant by the deliberate use of a deadly weapon, and without cause or excuse killed Jerome Palmer in this county and state on or about the 17th day of November, A. D. 1920, and nothing else is shown, an intent to murder in the second degree would be conclusively proved, and your verdict should be, under such circumstances, guilty of murder in the second degree, but in order to find the defendant guilty of murder in the first degree there must be additional proof beyond a reasonable doubt that there was deliberation and premeditation upon the part of the defendant, and it must be shown by the evidence that the design to kill the deceased was formed and matured in cool blood and not hastily upon the occasion.''

In that case the defendant, who had engaged in armed robberies, shot and killed a policeman who was attempting to arrest him. He admitted the killing and testified ''that he would not stand for arrest'' and that he was drunk and did not know why he shot. The instruction was sustained by this court in an opinion by Mr. Justice HARRIS, who said that, when read in connection with the remainder of the charge, it was in entire accord with the holding in *State v. Gibson*, supra.

The state calls our attention to *State v. Cody*, 116 Or 509, 241 P 983, in which an instruction on the statutory presumption, apparently without any modifying language, was approved as ''complete and correct'', and as following strictly *State v. Bartmess*, 33 Or 110, 54 P 167, which was decided before *State v. Gibson*, supra. Self-defense was interposed in both

the Cody and Bartmess cases. In the latter the court instructed that "an intent to murder is conclusively presumed from the deliberate use of a deadly weapon, causing death within a year, if not done in self-defense, or in the rightful and necessary defense of property". It was held that any error of which the defendant could complain was corrected by the court when it modified the instruction so as to inform the jury that the presumption created was not greater than murder in the second degree.

■■ From this review of our decisions it is apparent that they are not in entire harmony upon the question before us. The difficulty has come, we apprehend, from the endeavor of the court to apply a legislative mandate, which in many prosecutions cannot be literally followed, without coming in conflict with well-established principles of criminal law and endangering rights secured to the accused. Notwithstanding the emphatic language of the court in the Gibson case, "the jury, therefore, *should not be instructed* that an intent to murder is conclusively presumed from the act of killing by the deliberate use of a deadly weapon, unless nothing else appears in the case—no other testimony—to modify or excuse the act" (italics added), the court in subsequent cases has held that the instruction was free from error when accompanied immediately by language which shows that it is not a conclusive presumption at all. We see no reason why this lip service should continue to be paid both to the statute and the decision. It is certainly illogical and apt to produce confusion to tell a jury in one breath that there is a conclusive presumption of an intent to kill and in the next to submit that question to the jury as one of fact for their determination. No

one can deny that in particular cases there is not and cannot be such a conclusive presumption. In addition to the authorities cited in the Gibson case, see Wharton, op. cit., 135, § 100; *Raines v. State,* 81 Miss 489, 33 So 19; *Donnellan v. Commonwealth,* 70 Ky 676, 679; *State v. Newton,* 4 Nev 410; *State v. Rainsbarger,* 71 Ia 746, 31 NW 865. Why then is it not preferable to adhere to a rule which accords with sound reason and makes for clarity and consistency in the charge to the jury, and to hold that in cases where the statutory presumption is not applicable for the reasons stated in the Gibson case, the instruction must not be given and that the jury shall be told that the presumption of murder in the second degree from the deliberate use of a deadly weapon is only a disputable one, leaving to the jury to determine the fact from all the evidence including the presumption? This is the rule of the Gibson case, which is now reaffirmed as the law notwithstanding subsequent decisions which seem to have entrenched upon it. Even under those decisions, however, the instruction given in this case was erroneous, for there is nothing in the entire charge which directly modified it or explained it in such a way as to palliate it, as was done, for example, in the Walters and Bartmess cases; and there is ample evidence to rebut the presumption arising from the use of a deadly weapon by the defendant.

### III. CLAIM OF JUSTIFICATION.

Assignments of Error Nos. 1 and 2 are based upon the refusal of the court to give the following instructions requested by the defendant:

"III.

"I further instruct you that violation of the law as I have just stated it to you is a continuing

felony, and so long as the person charged with the crime has possession or continues to conceal a child under 16 years of age he is committing a criminal act.''

(The law referred to is § 23-434, OCLA, defining child-stealing.)

"VI.

"(a) If you find, therefore, that Clifford Shields is guilty of either forcibly, fraudulently or maliciously taking or enticing away Wanda Nodine, with the intent to detain or conceal her from her parents, as I have instructed above, or,

"(b) If you find that the defendant James Kay Nodine reasonably believed that Clifford Shields had done so, and,

"(c) If you further find that the defendant James Kay Nodine met Clifford Shields on the day of the shooting and demanded to know by the making of a threat against Shields the whereabouts of his daughter, and,

"(d) That the defendant reasonably believed that the demand in the manner and by the means made was necessary to prevent the continuation of the felony of child stealing, then you must find that the defendant was justified in using the means as herein defined, and,

"(e) If you find further that in justifiable pursuit of efforts to find and obtain possession of his daughter by the defendant, that Marius Sorenson was then accidentally killed in a struggle with the defendant over the rifle, then you must find the defendant not guilty.''

The court, instead of giving the foregoing requested instructions, after defining the crime of child stealing and stating that it went to the question of justification, instructed as follows:

"That briefly defines taking away or enticing child with intent to detain from parent, commonly called child stealing. But child stealing alone would

not justify a homicide or killing unless the crime was being committed at the time of the killing, or unless the killing was necessary to prevent an imminent or impending crime.

"The statutes relating to justifiable homicide relate to transactions in respect to persons present, or in the immediate vicinity, at the time and place of its occurrence, and have no application to a case in which danger is claimed to an absent person and is not imminent and impending and immediate danger. And homicide in defense of a daughter, to be justifiable, must be to prevent a present and impending felony, and reasonably necessary to prevent it, judged from defendant's position, and not a past offense nor future attempt or danger, unless such future attempt or danger, if any, is imminent, immediate and impending, and the killing reasonably necessary to prevent it."

Defendant excepted to the giving of the foregoing instruction and has made it the subject of Assignment of Error No. 5.

For a proper consideration of the legal questions raised by these assignments of error a more detailed statement of the evidence bearing upon the alleged crime of child stealing and the defendant's claim of justification becomes necessary. Shields lived with his wife and four children, ranging in age from two to ten years. He and defendant had known each other for a year or more before the homicide and were on friendly terms. The defendant's son Keith worked for Shields in his sawmill during the summer of 1951 and in May or June of 1952, and while so employed stayed at Shields' home. The defendant's daughter, Wanda, then aged fourteen, began to visit the Shields' home during the summer of 1951, and by the end of the year she was living there attending school and helping with the housework and the care of the chil-

dren. This was with the full consent of the defendant, or at least without any objection on his part. About May 1, 1952, the defendant told Shields and Wanda that he wanted his daughter to come home as he needed her help on his ranch. Wanda was not called as a witness in the case. According to Shields, Wanda did not wish to return home, and all the other evidence in the case on that subject is in harmony with Shields' testimony. Shields testified that she threatened to run away rather than go back to her father. On May 12 Shields took Wanda to Beaverton, Oregon, some 280 miles distant from Port Orford, and left her in the home of his wife's sister, where she remained until June 6. Shields saw the defendant after that and told him that Wanda had gone away, that he had received a letter from her, but that he did not know where she was.

On June 6 Shields and his wife brought Wanda back from Beaverton to their home, where she remained two days. About the seventh or eighth of June defendant's son, James K. Nodine, Jr., reported to his father that he had seen Wanda in Port Orford and that she did not want to return home. The defendant said that she might stay with his son, but that she was to keep away from Shields. Wanda then went with her brother to stay in the house of his parents-in-law, Mr. and Mrs. Joseph C. Fredericks. The younger Nodines lived in a small house nearby on property owned by Mr. and Mrs. Fredericks, about one mile distant from the Shields' home. Shields testified that when Wanda was taken away by her brother she was hysterical and sobbed because she had to leave. One week later, according to Shields' testimony, Wanda returned to his home in the middle

of the night, barefoot and breathless. She had left a note at the Fredericks' house, saying, "I am going to have them find me a new home. I can't come back." She told the Shields that she could not stand it any longer. Mrs. Shields was preparing to leave for Portland the following morning, and Shields and his wife decided to take Wanda to Beaverton again. They left that night with Wanda, and again placed her in the care of Mrs. Shields' sister in Beaverton. Shields returned to Port Orford on the afternoon of Tuesday, June 17. On June 18 Wanda was in Beaverton.

The defendant testified that, after learning early in May from Mrs. Shields that Wanda had left their home, he made inquiry at Wanda's school and was told that she had turned in her books and quitted school the day before. The next day defendant and his wife went to Gold Beach to see Judge Forsyth, the county judge of Curry County, and asked him to institute a search for Wanda as a missing person. The defendant told Judge Forsyth about Shields, gave him a picture of Wanda, and Forsyth promised to turn the information over to the state police. Nothing came of the search, if any was undertaken. After this the defendant heard rumors about misconduct or improper relations between Wanda and Clifford Shields, which worried him greatly. Upon this subject he testified, among other things, to the following:

"Q Was there communicated to you a report that your daughter had made a statement on the Sixes River bus to other students on the Sixes River bus, during the month of March, 1952, that she was doing well at the Shields house, for all she had to do to make Five Dollars was to sleep with Mr. Shields, did you hear that report?

"A That is correct.

"Q  Did you also hear a report which was circulating in that community, and communicated to you, that your daughter and Mr. Shields had been out all night together on a trip to Gold Beach?
"A  I did."

The defendant testified that he feared Wanda had been sold into white slavery or that something equally bad had happened to her.

The defendant further testified that while Wanda was staying with Mr. and Mrs. Fredericks she came to his home one day to get a silk dress, and that she seemed to be pretty mad. He told her that she was to stay away from the Shields' home.

About noon on June 17 the defendant was informed by his wife's sister, Suzanne Smith, that Wanda was at the Shields' place again. He thereupon went to the office of Judge Niemann, justice of the peace at Port Orford, reported this information to him, and asked if he should "file a warrant for her", but Niemann advised him that she was a minor child, that he did not need a warrant, and that he should go and get her. (According to Niemann's testimony, nothing was said about a warrant in this conversation.) The defendant then asked for Fred Jamison, a deputy sheriff, and was told by Niemann that Jamison was not very well, that it was his day off, and that he might be home. The defendant also suggested that if Niemann would telephone the state police he, the defendant, would pay for the phone call, but Niemann said that he didn't know "where he could get one". The defendant left, saying that he would see if he could find Jamison. Before leaving he made the statement, "I am going to get my daughter, I will take a 30-30 rifle, and if I need to I will use it". Niemann rejoined, "well, I don't believe I would do that, it will

get you in a lot of trouble.'' The defendant went to the house where Jamison had formerly lived and ascertained that he had moved. Without making any further effort to find the deputy the defendant drove up the Sixes River Road towards the Shields' place, and on the way had a flat tire. He had no spare tire with him and was obliged to leave the car and return home. The next day he went back to his car with a spare tire, put it on the car, and resumed his journey up the Sixes River Road. As heretofore stated, he found no one at the Shields' house. He then went to the house of Mrs. Rachel Fredericks and was told there that Wanda had been gone a couple of days, that she had left a note and taken out for a new home. Mrs. Fredericks, who was a witness for the defendant, testified that he said ''if there was any resistance up there he had a 30-30 and could run a good bluff'', and that she tried to get him ''to go to the cops'', but that he said ''they wouldn't give him any help and he felt as though in desperation he would have to act his own self.'' At Mrs. Fredericks' suggestion he went to the Shields' mill. There he talked to a Mr. and Mrs. Harp and a Mr. Michaels. Harp and Michaels were employees of Shields. He was told that they did not know where Wanda was and that Shields had gone to town. As he was leaving he told them to tell ''that boss of yours I'm hunting for my girl and I'm going to find her or you will have a new boss.'' He continued down the Sixes River Road until he met the car in which Shields and Sorenson were riding, with the results already related.

The effect of requested Instruction VI, had it been given, would have been to advise the jury that if they found that Shields was guilty of the crime of stealing

the defendant's child, or that the defendant reasonably believed that Shields was so guilty, and that defendant made a demand to inform him of the whereabouts of his daughter, and that defendant reasonably believed that such demand in the manner and by the means used (i.e., by pointing a gun) was necessary to prevent the continuation of the crime of child stealing, then defendant was justified in using such means. And, further, that if the jury found that "in justifiable pursuit of efforts to find and obtain possession of his daughter by the defendant," Sorenson was accidentally killed in a struggle over the rifle with the defendant, then the jury must find the defendant not guilty.

It will be noticed that the defendant did not by his request seek to justify the *intentional* killing of anyone, but only to justify the pointing of his rifle at Shields as a means of enforcing his demand for information about his daughter. Thus, by the circumstances suggested, the otherwise unlawful act of pointing a gun at Shields would be converted into a lawful act. Further, the requested instruction is silent on the defendant's intention in making the threat by the means described. It does not negative an intent to kill, and, as we read it, would authorize a verdict of not guilty even though such an intent were present. That would seem to be the view of its meaning and effect held by counsel for defendant, who supports the instruction by the contention, among others, that the killing of Shields would have been justified as an act done for the purpose of preventing the commission of a felony.

The offense of child stealing is denounced by § 23-434, OCLA, which reads as follows:

"Every person who maliciously, forcibly or

fraudulently takes or entices away any child or minor under the age of 16 years, with intent to detain and conceal such child from its parent, guardian or other person having the lawful charge of such child, shall, upon conviction thereof, be punished by imprisonment in the state penitentiary not less than one year, nor more than 25 years, or during the natural life of such person, or by fine not exceeding $10,000, or by both such fine and imprisonment."

In *State v. Metcalf*, 129 Or 577, 595, 278 P 974, this crime was said to be "in some respects like larceny of an animal; it is a continuing offense". It was further held that the child could not consent to her abduction, and that as to a charge of fraudulent taking, "The fraud was not committed against the child, but against the parent."

As stated, the argument in support of the requested instructions invokes the rule that it is justifiable to kill in order to prevent the commission of a felony. In Oregon, as in many other states, that rule is incorporated in a statute, § 23-417, which provides in part:

"The killing of a human being is also justifiable when committed by any person as follows:

"(1) To prevent the commission of a felony upon such person or upon his or her husband, wife, parent, child, master, mistress, or servant;

"(2) To prevent the commission of a felony upon the property of such person, or upon property in his possession, or upon or in any dwelling house where such person may be".

There is also a suggestion in defendant's brief that the case falls within Subdiv. (3) of the foregoing statute, which declares the killing of a human being justifiable when committed "in the attempt, by lawful

ways and means, to arrest a person who has committed a felony". (For the right of a person to arrest for felony see §§ 26-1532, 26-1537, OCLA.) But this may be put out of view, for the act relied upon as constituting an arrest must have been performed with the intent to effect an arrest and must have been so understood by the party arrested. 4 Am Jur 5, Arrest, § 2. "To justify the homicide of a felon for the purpose of arresting him, the slayer must show that he avowed his object, and that the felon refused to submit." 1 Michie, Homicide, 317, § 105. See also, *State v. Bailey*, 179 Or 163, 182, 170 P2d 355; Restatement, Torts, § 128. There is no pretense in defendant's testimony nor any evidence in the record that he was attempting to arrest Shields.

It is urged by defendant that, since child stealing is a crime against the parent and not against the child and is a continuing offense, the means taken by the defendant to obtain information as to the whereabouts of his daughter and to recover her custody and control were justifiable means to prevent the further commission of a felony then in progress.

For the purposes of the present discussion it may be conceded that there is evidence from which it could be found that Shields was guilty of the offense of stealing the defendant's child by fraud, or at least that the defendant could reasonably have believed that this was the case. This being so, the question is: Was it lawful for the defendant to back up his demand that Shields tell him where his daughter was by a threat to kill him and the means to enforce that threat if the information was not forthcoming? Under the circumstances of this case we think the answer to that question must be in the negative.

■ The rule which justifies homicide to prevent the commission of a felony is one of limited application. It is thus stated in 26 Am Jur 239, Homicide, § 123:

"Among the recognized excuses for the taking of human life is the prevention of crime. The killing of a person to prevent the commission of any forcible and atrocious crime has been considered as justifiable from the earliest days of the common law. The right to kill, however, even to prevent such crimes, is limited to absolute or apparent necessity, and all other means of preventing the crime must first be exhausted. The danger must not be problematical or remote, but evident and immediate. It need not, however, be real; if there is reasonable ground to believe the danger exists, this is sufficient."

In 1 Michie, Homicide, 319, § 107, the author says:

"Homicide to prevent *violent or atrocious* felonies, as, for instance, murder, rape, adultery or seduction, etc., robbery, theft at night, burglary, arson and train wrecking is either justifiable or excusable, but larceny, though made a felony by statute, will not justify killing the felon, though necessary to the recapture of the stolen property. * * * While it is true at common law, and in certain cases, under the Codes, that one person may kill another for the prevention of a forcible and atrocious crime, still, to make such homicide justifiable, *there must be an absolute necessity for it;* and it must be in good faith, for the purpose of preventing harm, and not from a private motive, and upon reasonable grounds to believe that there is a design to commit a felony. To justify homicide to prevent perpetration of felonies other than homicide, the danger or felony intended must not be problematical or remote, but evident and immediate. It is immaterial, to the justification of homicide in resisting a forcible felony, whether the act was a felony at the common law or made such by statute." (Italics added.)

We quote from Wharton on Homicide (3d ed.):

" * * * Nor does the general rule justifying homicide to prevent felony authorize the killing of persons attempting secret felonies, not accompanied by force, such as mere larceny, or picking pockets. And where a felonious act is not of a violent or forcible character, as in case of crime partaking of fraud rather than of force, there is no necessity to prevent, and, therefore, no justification for homicide." (P. 765, § 514.)

"The common-law doctrine was that, to justify homicide for the prevention of a forcible or atrocious crime, there must have been *absolute necessity* for the act. Killing a man was justifiable homicide only where there was an intention upon the part of the person killed to rob or murder, or do some serious bodily injury to the slayer or another, rendering such killing necessary to prevent it. And under the general statutes existing in most, if not all, of the states, to excuse one person for taking the life of another there must exist a necessity to prevent the commission of a felony or the infliction of great bodily harm, or a reasonable belief in the mind of the slayer that such necessity exists." (Italics added.) (P. 765, § 515.)

See, also, *Weaver v. State,* 19 Tex Cr App 547, 53 Am Dec 389; *People v. Doud,* 223 Mich 120, 193 NW 884, 32 ALR 1535; *Storey v. State,* 71 Ala 329; *State v. Terrell,* 55 Utah 314, 186 P 108, 25 ALR 497, annotation at p. 508; *Commonwealth v. Beverly,* 237 Ky 35, 34 SW2d 941; *Pond v. People,* 8 Mich 150, 177; 1 Bishop, Criminal Law (9th ed.) 622, § 875, and see §§ 853-861.

The decisions in homicide cases which counsel for defendant has called to our attention represent no departure from these principles. Rather, each of them is a case in which the defendant, acting in circumstances of urgent necessity, resorted to the use of a deadly weapon to prevent the deceased from committing a

felony then and there attempted by force. Such are *Oliver v. State*, 17 Ala 587; *Moore v. State*, 91 Tex Cr Rep 118, 237 SW 931; and *Cole v. State*, 45 Tex Cr Rep 225, 75 SW 527. Other cases cited by the defendant in which the crime charged was assault and battery (*State v. Morgan*, 25 NC 186, 38 Am Dec 714), or assault with intent to kill (*People v. Connors*, 253 Ill 266, 97 NE 643, Ann Cas 1913A 196 and *Hairston v. State*, 54 Miss 689, 28 Am Rep 392), are of like kind.

There is no need to burden this opinion with a discussion of the facts of all these cases. It may be observed, however, that *Oliver v. State* and *Cole v. State* and *Moore v. State* appear to have been cited because they involve parental rights. In the first case the homicide occurred immediately following a struggle between the accused and the deceased, who had threatened to take the children of the former from him, the children being then present. In the struggle both parties drew deadly weapons, though they were not used. Following this the defendant shot the deceased. The evidence was such that the jury might have found that the accused reasonably believed that the deceased was about to carry out his threat to take the children away from him. A judgment of manslaughter in the first degree was reversed because the court instructed the jury that if the deceased had taken the defendant's children under the circumstances he would not have been guilty of a felony. The Alabama statute against child stealing is almost identical with ours, and the court held that it was for the jury to determine the intention of the deceased in threatening to take the children. Upon the question of justification the court said:

" * * * To justify the taking of life there must be an imperious necessity to prevent the com-

mission of a felony or great bodily harm. Without this necessity, the law, although under some circumstances it will mitigate the crime to manslaughter, cannot hold the party slaying altogether justified.

"* * * If the circumstances be such as to induce a reasonable belief that such necessity exists, the law will acquit the slayer of all guilt; but if there is no reasonable ground for believing that there is such a necessity, then the law cannot acquit him." 17 Ala 598, 599.

In *Cole v. State* defendant was convicted of second degree murder for killing his father-in-law. Defendant and his wife were living in the home of the deceased. The relations between the defendant and his father-in-law were badly strained, and the latter had threatened to kill the defendant if he attempted to carry his wife from the home of the deceased. On the day of the homicide when the deceased and his wife were away from the house defendant and his wife decided to leave. They were about to drive away in a buggy, taking their baby with them, when the deceased and his wife appeared. The deceased threatened to prevent their leaving. A struggle ensued over a gun which defendant had put in the buggy, and defendant finally grabbed the gun and shot his father-in-law, killing him. The judgment was reversed because proper instructions were not given on manslaughter and justification. As to these matters the court said:

"* * * In other words, appellant's insistence along this line was that, in regard to manslaughter, if deceased was seeking to take appellant's wife and child from him to prevent him carrying them away, and was approaching him for that purpose, and was in the act of doing so, and he shot. and killed to prevent this, it would be manslaughter. This would be such provocation as would require

a pertinent charge on manslaughter; and if it was necessary to prevent deceased from taking the wife and child, and if, preventing this, he was in danger of death or serious bodily injury, then it would be justifiable homicide.''

In each of these cases, there was a homicide to prevent the commission of a felonious act then and there attempted by force, together with evidence that resistance to such act could result in death or great bodily harm to the defendant.

*Moore v. State* was decided under a statute which declares that homicide is permitted by law when committed for the purpose of preventing various named offenses, including statutory rape. The court recognized the general rule ''with certain limitations'' that ''a homicide may be justifiable when committed to prevent the commission of a felony *by violence*'' (italics added), but in view of the statute held that the defendant, a mother who shot the deceased when it appeared that he was about to commit the crime of rape, apparently without violence, upon her minor daughter, was entitled to have the defense of justification submitted to the jury. Both because of the statute and the fact that the crime was at the time impending the case is not in point here.

*State v. Young*, 52 Or 227, 96 P 1067, 132 Am St Rep 689, 18 LRA (ns) 688, illustrates the principle in question. The defendant there shot and wounded a man who he believed was intending to commit the crime of adultery with his wife. He was convicted of assault with a dangerous weapon. He sought to justify his act under the provision of the statute which declares the killing of a human being justifiable when committed to prevent the commission of a felony upon his wife. But, since the evidence was that the de-

fendant believed that the deceased was seeking to accomplish his purpose "by artifice and the active cooperation of the wife", and since she was not present at the time of the shooting and could not have been the subject of an assault by the deceased, the court held that the facts relied on constituted no justification. After observing that "though adultery is a felony under the statute, it is not a felony upon the party intending to voluntarily participate therein" the court concluded:

"Such circumstances, therefore, furnish no basis for a husband to invoke the principle of a necessary assault in defense of his wife. So too, 'statutes with reference to homicide, justifiable because committed in defense, relate to transactions occurring in respect to parties present at the time and place of its occurrence, and have no application to a case in which the danger is to an absent person.' Wharton, Homicide (3d ed.) 772. And homicide in defense of the chastity of a wife, to be justifiable, must be to prevent a present and impending violation thereof, and reasonably necessary to prevent it, not a past offense or future attempt. Wharton, Homicide, pp. 769-773."

So it was held in *Gossett v. State,* 123 Ga 431, 51 SE 394, that a father may slay to protect the chastity of his minor daughter, but the idea of prevention or defense against an impending or progressing wrong must be involved, the court saying, "the law will not justify deliberate revenge. However grevious a past wrong may have been, the law does not trust its punishment to individual vengeance." See, also, Wharton, op. cit., 775, § 520.

The defendant cites §§ 131 and 143 of Restatement, Torts, the former dealing with the right to use force intended or likely to cause death in making an arrest,

and the latter with the use of force likely to cause death or serious bodily harm in preventing a felony, together with Comment g to § 131, 1 Restatement, Torts, p. 303. These sections have been changed in the 1948 Supplement of the Restatement. Much of the comment referred to has been deleted. See 1948 Supplement, p. 630. Section 143 (2), as originally adopted, read:

> "The use of force or the imposition of a confinement intended or likely to cause death or serious bodily harm is privileged if the felony for the prevention of which the actor is intervening is of a type threatening death or serious bodily harm or involving the breaking and entry of a dwelling place."

The section was changed in the 1948 Supplement by inserting therein, after the word "if", the words (which, as the commentary shows, had been inadvertently omitted) "the actor reasonably believes that the commission or consummation of the felony cannot otherwise be prevented and". To the subsection was appended the following comment as a substitute for Comment b in the original statement:

> "The statement in this Subsection permits the use of means intended or likely to cause death or serious bodily harm for the purpose of preventing murder, voluntary manslaughter, mayhem, robbery, common law rape, kidnapping and burglary". 1948 Supplement, p. 636.

Statutory rape, which is not a crime of violence, it will be observed, is not included. Kidnapping is included, and it may be conceded that child stealing, as defined in our statute, is a species of kidnapping. Other statutes define "Seizing, confining or kidnapping another (§ 23-433, OCLA) and "Abduction or holding for reward or ransom" (§ 23-435, OCLA). In

view of an argument in defendant's brief based on a hypothetical state of facts which include a meeting for the payment of ransom to recover a kidnapped child, we may observe that we are not dealing here with a Lindbergh case, or anything remotely resembling it. It is not believed that the law on this subject in civil cases, as declared in the Restatement, is different from the law in homicide cases enunciated in the adjudicated cases and by authoritative writers on the subject.

Defendant argues that his demand that Shields tell him of the whereabouts of his daughter was a lawful one. This may be true, but the question is whether he had a right to make a demand accompanied by a threat to kill with a loaded rifle. The cases on which defendant relies do not so hold. In *Hairston v. State,* supra, the defendant drew a gun and threatened to kill a man who attempted to stop a team of mules which he was driving. The demand was held to be proper. And, as the threat to kill was conditioned upon compliance with it, the court held that *"while the law will not excuse the assault actually committed in levelling the pistol within shooting distance,* it cannot from this fact alone infer an intent to murder." (Italics added.) There being, as the court thought, no other evidence to show an intent to murder, a conviction of assault with intent to murder was set aside. On a similar state of facts the court in *State v. Morgan,* supra, reached the opposite conclusion by reasoning which to our minds appeals as having more persuasive force than the opinion in the Hairston case. On the other hand, in *People v. Connors,* supra, the demand, accompanied by a threat to kill and the use of a loaded revolver, was unlawful and the court held that, even

though the assailant suspended his unlawful purpose merely to give his victim a chance to comply with the unlawful demand, the offense of assault to murder was complete, the court observing, however, that *"the law will not tolerate excessive violence or intimidation for the purpose of enforcing or defending one's legal rights"*. (Italics added.)

Any civilized system of law recognizes the supreme value of human life, and excuses or justifies its taking only in cases of absolute necessity. It is for that reason that the right to kill to prevent the commission of a felony does not extend to secret felonies not committed by force or to remote and problematical dangers. There is no suggestion in the evidence that any force was used by Shields to secure and keep the custody and control of the defendant's daughter, or that the defendant believed, or had any reason to believe, that such was the case. Shields offered no resistance when the defendant's son took Wanda away a week or so before the tragedy, and she returned to Shields' home later in the middle of the week voluntarily. The continuing character of the offense of child stealing will not alter the application of the fundamental principle to this case.

In *State v. Metcalf*, supra, the crime of child stealing was said to be in some respects like larceny of an animal. It would be absurd, of course, to carry the analogy too far and to hold that a parent, bent on recovering his minor child, is circumscribed by the same rules as the owner of a stolen horse, who pursued the thief for the purpose of recapturing his property. See *Storey v. State*, supra. The parent is justified under the statute in killing one to prevent the commission of a felony by force upon his child. But the

defendant would not have been justified in killing Shields to recover his daughter. Under the evidence in this case that could be found to be an act of private vengeance for past wrongs. There is no evidence of an immediate threat to the life or safety of Wanda. She was not present, but was some 280 miles away in Beaverton. The defendant, no doubt, did not know where she was, but he knew that she was not at the scene of the homicide, that she was not even at Shields' house. The danger to her, if any, was problematical and remote, not evident and immediate. The defendant knew, also, that at the time Shields was on a peaceful errand. He was offered no personal violence by Shields or Sorenson. He could not have entertained a reasonable belief that extreme measures were necessary. The rule stated by Wharton and approved by this court in *State v. Young,* supra, that "statutes with reference to homicide, justifiable because committed in defense, relate to transactions occurring in respect to parties present at the time and place of its occurrence, *and have no application to a case in which the danger is to an absent person*" (italics added), applies in all its force to the present case. That rule is embodied in the instruction on this subject given by the court. The defendant was entitled to nothing more favorable. It may be added that the defendant's own appraisal of the lack of urgency in the situation is revealed by his conduct. He did not press on to his goal after the automobile tire went flat, as a man would be expected to do who feared his daughter was in danger, but returned home, spent the night there, and the following morning, as he testified, milked twenty cows, cleaned up the separator, and fed the pigs and cows before starting out again on his ill-fated quest.

■ We have discussed the present question as though the defendant intentionally killed Shields or intended to shoot him and by accident shot Sorenson. If, however, the truth of defendant's version of the killing be assumed, it was still an unlawful act for him to point his loaded gun at Shields and threaten to kill him. It would be assault with a dangerous weapon (§ 23-431, OCLA). *State v. Young*, supra; *State v. Carroll*, 155 Or 85, 89, 62 P2d 830; *State v. Godfrey*, 17 Or 300, 307, 20 P 625, 11 Am St Rep 830. The same principle of law which makes unavailable to defendant the defense of justification to a charge of intentional killing denies to him the right to use a weapon likely to cause death and which in this instance did cause death. 6 CJS 953, Assault and Battery, § 95; 1 Bishop, Criminal Law (9th ed.) 613, § 862; *State v. Terrell*, supra. And, though in these circumstances the killing were accidental, it would not be justified. § 25-104, OCLA, which declares it unlawful to point a gun at another, makes an exception of the act when done in self-defense. The term self-defense is used in this statute in a broad sense, and includes the right to kill in defense of one's child or to prevent the commission of a felony. *State v. Trent*, supra, 122 Or 474. Since, as we hold, such a defense is not made out by the evidence in this case, the defendant was guilty, at least, of the misdemeanor defined in the section cited. And, though Sorenson was accidentally killed, since the homicide occurred in the doing of an unlawful act, the offense would be involuntary manslaughter. A homicide in such a case would not be held to be a misadventure. *Johnson v. State*, 94 Ala 35, 10 So 667.

The defendant urges that the question whether the pointing of a gun under the circumstances was reason-

ably necessary is for the jury to decide, citing 26 Am Jur 511, Homicide, § 512. That is, of course, the rule where the evidence is such as to justify submission of the question. But whether or not there is such evidence is a question of law for determination by the court. It is said in Wharton, op. cit., 557, § 343:

"What facts excuse or justify homicide, however, is a question of law. It is the province of the court to state what the rules of law are, and it is that of the jury to determine whether such facts existed in the particular case. And it is strictly within the province of the court to determine whether the evidence was sufficient to establish legal justification on the ground of self-defense, and to state its determination in its charge."

See, also, *State v. Young*, supra; *Gladden v. State*, 12 Fla 562; *Franklin v. State*, (Tex Cr App) 88 SW 357; *State v. O'Neil*, 58 Minn 478, 59 NW 1101.

We conclude that the evidence in this case is not sufficient to warrant submission to the jury of the issue of justification or self-defense, and therefore that the assignments of error under consideration are without merit.

### OTHER ASSIGNMENTS OF ERROR.

Assignments of error 6, 7, 8 and 9 are directed to rulings upon the admission or exclusion of evidence. We will dispose of them by merely indicating our conclusions.

Number 6. The testimony was properly admitted.

Number 7. Exclusion of the question asked on cross-examination of the witness Shields would probably not be reversible error, but the question was proper cross-examination.

Number 8. The record does not show what the answer would have been had the witness been per-

mitted to give it. Therefore, the assignment presents no question for review. If on another trial the question should again arise in the same manner and on a similar record, and defendant offers to prove facts which contradict testimony given by the witness Shields on the same subject, the evidence should be admitted.

Number 9. Exclusion of the proferred testimony was error.

The judgment is reversed and the cause remanded for further proceedings in conformity to this opinion.