Argued September 12, affirmed October 27, petition for rehearing
denied December 28, 1956

# STATE OF OREGON *v.* AVENT
## 302 P. 2d 549

182

*George H. Corey,* Special Assistant Attorney General and Special Prosecutor, Pendleton, argued the cause for respondent. With him on the brief were Robert Y. Thornton, Attorney General, Salem, and Bradley D. Fancher, District Attorney, Heppner.

*Charles E. Raymond* and *Donald E. Kettleberg,* Portland, argued the cause and filed a brief for appellant.

Before WARNER, Chief Justice, and ROSSMAN, LUSK, BRAND, PERRY and McALLISTER, Justices.

LUSK, J.

The defendant was indicted for second degree murder, was convicted as charged, and has appealed.

Defendant's brief contains six assignments of error. Two of these, based on the court's refusal to instruct the jury, in effect, that they could find that the defendant would have been justified in killing the victim of the homicide in order to prevent him from enticing away or stealing her child, were abandoned on the argument, and properly so, by counsel for the defend-

ant. Three of the assignments were directed to rulings to which no exception was taken on the trial, and the remaining one to the court's denial of a motion for a new trial.

■ It should be borne in mind that it is only in rare cases that this court will notice an alleged erroneous ruling of the trial court to which no exception was taken or objection made by the appellant. From a very early date the rule has been that it is not error only, but error legally excepted to, which affords ground for reversal. The rule applies in criminal as well as civil cases. *State v. Cory,* 204 Or 235, 282 P2d 1054; *State v. Nodine,* 198 Or 679, 686, 259 P2d 1056. It is sometimes less strictly enforced in criminal, and especially in capital, cases, but even then it will not be relaxed unless the court, upon an examination of the entire record, can say that the error is manifest and that the ends of justice will not otherwise be satisfied.

■■ One of the main purposes of an objection or exception is to afford the trial court an opportunity to correct its error. *Kuhnhausen v. Stadelman,* 174 Or 290, 311, 148 P2d 239, 149 P2d 168. Here, the first assignment of error is based upon an instruction which advised the jury that their verdict must be unanimous. Under the Oregon Constitution, Art I, § 11, ten members of the jury may render a verdict of guilty or not guilty in a criminal prosecution in the circuit court, "save and except a verdict of guilty of first degree murder, which shall be found only by a unanimous verdict." The instruction complained of was obviously an inadvertence on the part of the judge, and would undoubtedly have been corrected by him had the error been called to his attention at the time. Whether counsel for the defendant were equally inadvertent, or whether they were content to let the instruction go by as not

unfavorable to the defendant, we have no way of knowing. At any rate, the verdict was unanimous, and, in view of the entire record, we are satisfied that the instruction was not harmful to the defendant. There is no reason whatever to believe that, but for the instruction the jury, or ten of their number, would have found the defendant not guilty. The record shows that the court commenced its charge at 12:30 P.M. and the jury returned with its verdict at 4:30 P.M. of the same day. Presumably, the jury followed the time-honored custom of going to lunch before commencing their deliberations. The short time which they took for agreement upon a verdict would indicate that they found the case a clear one.

Before considering the remaining assignments of error we will review the evidence briefly.

The defendant was employed as a bartender in O'Donnell's Cafe in Heppner, Oregon. She was the divorced wife of Fred Avent, and the victim of the homicide was Avent's attorney, Delmore Lessard, a member of the Oregon bar with offices in Portland. By the decree of divorce the defendant had been awarded custody of her son, aged 14, who lived with her and was at a Scout camp some fifty miles from Heppner on June 4, 1955, the day of the homicide. On that day Avent and Lessard went to Heppner from Portland, and at about 5:00 o'clock in the afternoon Lessard, having made an appointment with the defendant by telephone, met her in the bar where she worked. They sat in a booth talking for a few minutes. According to the defendant's testimony, Lessard said that he had come to Heppner for the purpose of taking the boy back and putting him in an orphanage. She testified that he called her a "dirty flub" and unfit to have custody of the boy. After a few minutes con-

versation the defendant went into the restaurant which adjoined the bar, and was followed by Lessard. The defendant returned to the bar and armed herself with a .38 Smith-Wesson revolver, six shot, which had been left there by its owner and was kept on a shelf under a cigarette counter. She returned to the restaurant carrying the revolver under a jacket which hung over her arm. Lessard was still there. She uncovered the revolver, and, as he retreated along the aisle between the counter where food was served and a double row of booths paralleling the counter, she pulled the trigger. Three times the trigger fell on empty cylinders. The fourth time a bullet was fired which penetrated the back of a cigarette vending machine which stood at the end of the row of booths farthest from the bar and near the street entrance to the restaurant. At the time that this shot was fired Lessard was crouched behind the machine which fell toward the food counter, apparently as the result of a push given it by Lessard, who continued his retreat back towards the bar between the double row of booths, but before he could make good his escape the defendant shot again, and this time the bullet took effect, entering the man's temple area above the right ear and lodging at the back of the skull. Death appears to have been instantaneous. The foregoing facts are established by uncontradicted evidence.

Mary Snow, a waitress in the restaurant, was an eye witness to the shooting. She testified as a witness for the state that, when Lessard came from the bar into the restaurant, she and another waitress were seated on stools at the end of the food counter nearest the bar. Lessard stopped and asked them for Mr. and Mrs. O'Donnell. The defendant came from the bar into the restaurant with a white jacket over her arm,

said to Lessard, "Are you still looking for trouble, Mr. Lessard?", and "ripped" the jacket off her arm, revealing a revolver in her hand. The witness, Mary Snow, testified that Lessard backed up; that the gun clicked three times; that the defendant kept after him, and he finally got in back of the cigarette machine, "and he was just talking like mad to her"; that she said nothing; that she shot and hit the cigarette machine, and "then he stabbed it some how or other and evidently it was to protect himself and make her stumble so that he could go around and get to the bar"; that the cigarette machine fell on the back of two stools at the food counter; that she retraced her steps, and, while Lessard was between the booths heading for the bar, she shot again, "and when I looked again, there wasn't any body there."

Additional evidence produced by the state tended to corroborate that of the witness Mary Snow. The testimony of the defendant, the sole witness for the defense, in its essential particulars, scarcely can be said to contradict the state's case. She swore that when she went back to the bar, after her conversation with Lessard had ended, she saw the gun sticking under the counter and took it because she wanted to unload it and put the shells in her pocket, but that she did not know that it broke in the middle; that she took her coat and threw it over her arm, holding the gun in her hand; that she then returned to the restaurant and walked up to Lessard and warned him to quit causing trouble and to get out of Heppner; that Lessard "glared" at her and "put his hands up"; that she "quickly uncovered the gun" because she was "so terribly afraid of him"; that she had no intention of killing Lessard or hurting him. When she uncovered the gun he started towards the door (meaning the one

that opened on the street), she following him, and the next thing she knew the cigarette vending machine was crushing her against the restaurant counter. Her only coherent thought was that Lessard was going to kill her and take her boy. ''There was a deadening noise, a terrific noise and a white flash, and I am sorry I cannot tell you how I got back to the bar.'' She claimed that she could not tell when the gun went off or where or how. After the shooting she returned to the bar, laid the gun down and sat in a booth.

■ Lessard was unarmed, and there can be no question under the evidence about the fact that, from the moment the defendant uncovered the revolver until he was killed, he was retreating from her. Her felonious intent is conclusively shown by the fact that she pulled the trigger five times before accomplishing her purpose.

■ The second assignment of error is directed to the admission in evidence of the testimony of Judge Virgil H. Langtry, a circuit judge from Multnomah County. There was no objection to his testimony. He was called as a witness in rebuttal by the state on an issue raised by the defendant in her testimony. Under permission of the court, and with little or no objection on the part of the prosecution, the case had all but degenerated into a trial of the defendant's ex-husband and his attorney, Mr. Lessard. The defendant told at length of her ex-husband's bad character and marital misconduct, of his disobedience of the court's order for the payment of support money for herself and children, and resulting contempt proceedings, of his conviction on a charge of nonsupport, and of the harassment to which she was subjected by Avent and Lessard in connection with all these matters. Judge Langtry's testimony tended to show that in one in-

stance at least it was the defendant herself who was guilty of harassing her ex-husband.

■ The fifth assignment of error complains of an instruction which the court gave embodying the statutory conclusive presumption of "an intent to murder from the deliberate use of a deadly weapon, causing death within a year." ORS 41.350 (1). The defendant took no exception to the instruction, but argues here that it was erroneous in view of our decision in *State v. Nodine*, supra, 198 Or at 690–696.

The ends of justice do not require us to consider the merits of the second and fifth assignments of error. Unless it is to be held that a person who shoots and kills another, under the circumstances disclosed by the evidence here, is to be excused because she testified that she intended no harm to her victim, and was in fear of him, and could not remember what she had done, then it must be said that the jury only discharged its duty in returning a verdict of second degree murder and there is no reason for this court to depart from customary procedure governing review of judgments on appeal. The jury was fully and carefully instructed on every phase of the case. The court even instructed on the law of self-defense. In that respect, as well as in the admission of evidence, the court's rulings were not only just but generous to the defendant. She was capably defended and she received a fair trial.

■ The final assignment of error is based on the court's denial of a motion for a new trial. The only question open for our consideration, raised by the motion, is the claim of newly discovered evidence. Affidavits were submitted of persons, including a doctor, a lawyer, and a judge, who expressed the opinion that the defendant was mentally confused, emotionally disturbed, of a highly suspicious nature, and suffering

from a persecution complex. Another affidavit made by her present attorney, Mr. Charles E. Raymond, shows that at the time of making it, October 26, 1955, which was nearly five months after the homicide, the defendant was confined in the criminal insane ward of the Oregon state penitentiary for observation. There was no notice at the time the defendant plead not guilty of a purpose to show in evidence that she was insane or mentally defective (ORS 135.870); and there is no showing whatever that evidence of the defendant's mental condition at the time the crime was committed could not, with reasonable diligence, have been discovered and produced at the trial. See ORS 17.610 (4). The motion for a new trial was, therefore, properly denied.

The judgment is affirmed.